65 A.3d 386

COMMONWEALTH of Pennsylvania, Appellant/Appellee
On Cross Appeal

v.

Ronald Grant CHAMPNEY, Appellee/Appellant
On Cross Appeal.

Supreme Court of Pennsylvania.

Submitted Sept. 1, 2009.

Decided April 24, 2013.

Andrea F. McKenna, Esq., Amy Zapp, Esq., PA Office of Attorney General, for Appellant.

Samuel J.B. Angell, Esq., David Lee Zuckerman, Esq., Defender Association of Philadelphia, Angela S. Elleman, Esq., for Appellee.

Before: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *ORDER*

PER CURIAM.

AND NOW, this 24th day of April, 2013, the Court being evenly divided, the Order of the trial court is AFFIRMED.

Justice ORIE MELVIN did not participate in the decision of this case.

Justice BAER files an opinion in support of affirmance in which Justice SAYLOR and Justice TODD join.

Justice EAKIN files an opinion in support of reversal in which Chief Justice CASTILLE and Justice McCAFFERY join.

## OPINION IN SUPPORT OF AFFIRMANCE

Justice BAER.

This case involves cross-appeals from the order of the Schuylkill County Common Pleas Court, which granted Ronald Grant Champney ("Champney") a new trial under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–9546. The common pleas court (hereinafter "PCRA court") awarded a new trial based on five separate instances of ineffective assistance of counsel. I would affirm the PCRA court's grant of a new trial on the ground that trial counsel was ineffective for failing to seek suppression of certain statements Champney made to police in the absence of counsel, after Champney had invoked his Fifth Amendment right to an attorney.

As Champney's claim alleges the ineffective assistance of counsel, I begin by reiterating the applicable standard. To prove counsel ineffective, the petitioner must demonstrate that: (1) the underlying issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) the petitioner was prejudiced by counsel's act or omission. *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973, 975 (1987). To determine the arguable merit of Champney's ineffectiveness claim, the underlying claim alleging a violation of the Fifth Amendment right to an attorney must be examined.

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court declared that an accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation. *Id.* at 474, 86 S.Ct. 1602. The right to counsel established in *Miranda* was intended to ensure that the defendant's right against compulsory self-incrimination was protected. In *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the High Court expanded upon its holding in *Miranda* and adopted a prophylactic rule that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interroga-

tion even if he has been advised of his rights." *Edwards*, 451 U.S. at 484, 101 S.Ct. 1880. The High Court explained that an accused, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484–85, 101 S.Ct. 1880. The reasoning behind such ruling is "to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey*, 494 U.S. 344, 350, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990).

For the *Miranda/Edwards* rule to apply, there must be an unequivocal invocation of the right to counsel, a requisite the Opinion in Support of Reversal finds lacking. The Supreme Court explained in *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) that "to avoid difficulties of proof and to provide guidance to officers conducting interrogations," the determination of whether the right to counsel was invoked by the accused is an "objective inquiry." *Id.* at 458–59, 114 S.Ct. 2350. Effective assertion of the Fifth Amendment right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." *McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (emphasis omitted); *see also Commonwealth v. Fears*, 575 Pa. 281, 836 A.2d 52, 61 (2003) (quoting *McNeil* 's holding in this regard). If the accused makes an ambiguous or equivocal reference that would lead an officer, in light of the circumstances, to believe that the accused *might* be invoking the right to counsel, the police interrogation need not cease. *Davis*, 512 U.S. at 459, 114 S.Ct. 2350 (emphasis supplied). Instead, the suspect must "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.*

The facts of *Davis* illustrate this point. There, during an interrogation conducted by law enforcement officers concerning a murder, the defendant stated, "Maybe I should talk to a lawyer." *Id.*, 512 U.S. at 455, 114 S.Ct. 2350. Unsure as to whether the comment constituted an invocation of the right to counsel, the officers asked the defendant whether he was requesting a lawyer, to which he responded, "No, I'm not asking for a lawyer." *Id.* The interrogation resumed and the defendant made incriminating statements. Thereafter, the defendant stated, "I think I want a lawyer before I state anything else," *id.*, and the questioning ceased.

The focus of the inquiry during the appeal in *Davis* was whether the defendant had invoked his right to counsel when he stated, "maybe" he should talk to a lawyer, but thereafter clarified that he was "not asking for a lawyer." [1] The United States Supreme Court declined the defendant's invitation to extend *Edwards* and require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney. *Id.* at 459, 114 S.Ct. 2350. Such a ruling, the Court reasoned, would needlessly serve as an obstacle to legitimate police investigative activity. *Id.* at 460, 114 S.Ct. 2350. Instead, the Court ruled that unless the suspect actually requests an attorney, questioning may continue. *Id.* at 462, 114 S.Ct. 2350. Acknowledging that it was "good practice" for law enforcement officers to further question the accused to clarify ambiguous references to counsel, the Court declined to adopt a rule requiring officers to ask clarifying questions. *Id.* at 461–62, 114 S.Ct. 2350. Emphasizing that the lower courts construed "Maybe I should talk to a lawyer" as not constituting a request for counsel, the Supreme Court saw no reason to disturb that conclusion. *Id.* at 462, 114 S.Ct. 2350.

The instant case is distinguishable from *Davis* because Champney did not use the equivocal term "maybe," and did

1. The High Court was not required to examine whether the statement, "I think I want a lawyer before I state anything else," was a clear invocation of the right to counsel, as Davis made no incriminating statements thereafter.

not provide a second statement contradicting his initial desire to speak with counsel. Instead, he declared, "I think I want to talk to Frank Cori [his attorney] before I make a statement." Contrary to the Opinion in Support of Reversal, I do not believe that employment of the phrase "I think," in and of itself, renders the statement equivocal, as such term can be colloquially used to express one's beliefs and not to suggest that one is pondering or contemplating an action. Viewing Champney's reference in light of what a reasonable officer in the circumstances would have understood the statement to mean, as *Davis* expressly directs, the PCRA court concluded that the import of the statement was clear. It found that Champney was not merely deliberating as to whether he might want an attorney, but rather was responding directly to Sergeant Shinskie's point blank inquiry, "Did you shoot Roy Bensinger?" Faced with the most obvious request for an admission of guilt, Champney replied, "I think I should talk to Frank Cori before I make a statement."[2] The PCRA court viewed this statement as a declaration of a desire to consult with a particular counsel prior to any further interrogation, and there is no basis in law or in fact to disturb this conclusion.

Having determined that the PCRA court properly held, on the basis of an adequately supported record, that Champney invoked his right to counsel, I next examine the effect such action has on the admissibility of his subsequent statements. One of the series of statements at issue was made on May 13, 1998, when Champney was being questioned by Sergeant Shinskie in a conference at the Schuykill County Prison, where he remained incarcerated on unrelated robbery

2. This affirmative statement that references a particular attorney's name is in stark contrast to a defendant's silence during a police interrogation. Thus, the Opinion in Support of Reversal's reliance on *Berghuis v. Thompkins*, 560 U.S. 370, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010) is misplaced. In *Berghuis*, the High Court, applying the *Davis* standard as set forth herein, ruled that a defendant's silence during police interrogation does not constitute a clear invocation of the right to counsel. The instant case, however, does not involve a defendant's silence, but rather a declaration that the defendant thinks consultation with counsel is necessary before he responds to a direct inquiry of whether he committed murder.

charges, and had not yet been charged with the instant murder. Despite Champney's prior indication in his statement of December 23, 1997, declaring that he would want Frank Cori present if questioned about the Roy Bensinger homicide, Sergeant Shinskie provided Champney with the standard *Miranda* warnings and obtained a written waiver of Champney's right to counsel.[3]

During the interview on May 13, 1998, when Sergeant Shinskie informed Champney that people had implicated him in Roy Bensinger's murder, Champney responded by asking the officer what he was "looking at." N.T., Mar. 22, 1999, at 8. Sergeant Shinskie believed this comment to mean that Champney wanted to know the probable jail time he would be facing if convicted of the murder. *Id.* When Sergeant Shinskie indicated that he would have to talk to the District Attorney regarding any deals, Champney directed him to get the District Attorney so that Champney could "lay it out" for him. *Id.* at 9. Additionally, when Sergeant Shinskie stated that a .30 caliber Winchester rifle was missing from the Bensinger residence, Champney responded by stating that the guns were kept in a locker in the basement. *Id.* Champney also nodded his head affirmatively when the officer stated that three bullets were missing from the victim's home. *Id.* at 9–10. Champney further indicated that the murder weapon had not been destroyed, although he refused to disclose the name of the individual who currently had the weapon. *Id.* at 10. To get a reaction from Champney, Sergeant Shinskie stated that an individual named Chris Reber was involved in the murder. *Id.* Champney then excitedly informed the officer that Reber

3. Champney's execution of a waiver of the right to counsel is of no moment, assuming he invoked properly his right to counsel, did not initiate the police encounter, and was in continuous custody. *See McNeil v. Wisconsin* 501 U.S. 171, 177, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (holding that where police initiate an encounter in the absence of counsel after the suspect invoked his right to counsel, assuming there has been no break in custody, the suspect's statements are presumed involuntary and are inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards).

was not involved in the murder, but had only "dropped" Champney off. *Id.*

I would conclude that the PCRA court's finding of arguable merit to the claim of trial counsel ineffectiveness is factually supported by the record and is legally sound. There is no question that the interrogation that occurred on May 13, 1998, was initiated by the police, as it was a formal interview, which Champney was required to attend, regarding his involvement in several unresolved crimes. Further, it appears undisputed that Champney remained in custody from his invocation of the right to counsel on December 23, 1997, through the time when he was interrogated while incarcerated in May of 1998.[4] Thus, the PCRA court did not err by holding that had trial counsel moved to suppress the statement Champney made on May 13, 1998, on the ground it was made in the absence of counsel after he had invoked his right to counsel, evidence of that statement would have been unavailable to the Commonwealth at the time of Champney's trial. *See* PCRA Court Opinion at 15.

The same, however, cannot be said for the statement Champney made on October 8, 1998. On that date, Sergeant Shinskie had a conversation with Champney, after he was arrested for the instant murder, and while he was in the police

4. The Commonwealth, as appellant, does not discuss whether there was a break in custody for purposes of *Edwards* or otherwise address the significance of the lapse in time of nearly five months between the invocation of the right to counsel and the subsequent police interrogation conducted in counsel's absence. I acknowledge the United States Supreme Court's ruling in *Maryland v. Shatzer*, 559 U.S. 98, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010), that the release of an incarcerated suspect into the general prison population for a minimum of two weeks constitutes a break in *Miranda* custody, which serves to terminate the protection afforded by *Edwards*. The Commonwealth has not sought to provide supplemental briefing to this Court on the effect of *Shatzer* on this appeal. Moreover, the Opinion in Support of Reversal acknowledges that *Shatzer*'s application herein is questionable considering that Champney was still in prison, not yet convicted or sentenced, and awaiting resolution of the charges against him. Opinion in Support of Reversal at 402 n. 7 (citing *Commonwealth v. Keaton*, 615 Pa. 675, 45 A.3d 1050, 1068 n. 9 (2012)). Accordingly, any question regarding the delay between Champney's invocation of his right to counsel and his subsequent police interrogation conducted in counsel's absence is beyond the scope of this appeal.

cruiser travelling from jail to the District Magistrate's Office for his preliminary arraignment. N.T., Mar. 22, 1999, at 16. As before, Sergeant Shinskie provided *Miranda* warnings and Champney executed a written waiver form. *Id.* at 15. After Champney got into the vehicle and was reading the probable cause affidavit, he made an unsolicited remark that Beth Bensinger probably got immunity. *Id.* at 17. Sergeant Shinskie indicated that was not the case, and suggested that Champney may want to talk with the District Attorney. *Id.* Champney stated he would not make a deal, but would instead take the death penalty because he did not want to spend the rest of his life in jail. *Id.*

Respectfully, unlike the PCRA court's analysis regarding the statements Champney made on May 13, 1998, which was based on an adequate record and correct application of the law, I would hold that the PCRA court erred as a matter of law in its ruling regarding the statement Champney made on October 8, 1998. The PCRA court held that such statement, which was indisputably unsolicited, would have been inadmissible had trial counsel sought to suppress it on the ground that it was given in the absence of counsel, after Champney had invoked his right to counsel. *See* PCRA Court Opinion at 9 (noting that "Shinskie testified that while reading the affidavit of probable cause, Champney, *unsolicited,* said that his co-defendant, Beth Bensinger, probably got immunity for her statements") (emphasis added); N.T., Mar. 22, 1999, at 17.

For the *Miranda/Edwards* rule to apply so as to warrant suppression of a statement, the police must have initiated the interrogation, and not the defendant. *See Commonwealth v. Edwards,* 588 Pa. 151, 903 A.2d 1139, 1151 (2006) (holding that where interrogation in the absence of counsel occurs after the defendant invoked his right to counsel, suppression is not warranted if the defendant initiated the conversation with police). Here, Champney's October 8, 1998, statement was unsolicited and not a product of police interrogation. Thus, the PCRA court erred by finding arguable merit in the claim of trial counsel ineffectiveness relating to its suppression. Accordingly, my discussion of the reasonable basis and preju-

dice prongs of the ineffectiveness test relate solely to trial counsel's failure to seek suppression of the statements Champney made on May 13, 1998.

Relating to the reasonable basis prong, trial counsel indicated that she had no tactical or strategic reason for failing to seek suppression of the incriminating statements Champney made on May 13, 1998, based upon his previous invocation of his right to counsel. N.T., Mar. 20, 2007, at 49–50.[5] The PCRA court accepted this testimony in concluding that Champney was entitled to relief on this claim. Thus, I would affirm the PCRA court's conclusion that trial counsel did not act pursuant to a reasonable trial strategy when she failed to seek suppression on this ground.

Finally, there is support for the PCRA court's conclusion that Champney was prejudiced by trial counsel's omission, particularly considering that it was the PCRA court judge who presided over Champney's trial and evaluated the evidence presented at the extensive PCRA evidentiary hearings.[6] *See Williams v. Taylor,* 529 U.S. 362, 396–97, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (emphasizing that the post conviction court's findings that led to the grant of collateral relief were made by the very judge who presided at the defendant's trial and also heard the additional evidence developed in the post-conviction hearing); *Commonwealth v. Collins,* 585 Pa. 45, 888 A.2d 564, 583 (2005) (acknowledging that the case presented somewhat of a "close call," but "err[ed] on the side of finding in favor of Appellant, based in part, on the deference that is due to a PCRA court's determination").

5. Trial counsel did not explain why she failed to include in her suppression motion a claim that Champney's May 13, 1998, statement was obtained in violation of his Fifth Amendment right to counsel, and instead alleged that the statement was involuntary due to an atmosphere of excessive pressure arising from police questioning about multiple crimes in multiple jurisdictions.

6. While the PCRA court found that trial counsel's cumulative errors were prejudicial to Champney, it expressly indicated that each error, by itself, sufficiently demonstrated prejudice, warranting a new trial. PCRA Court Opinion at 56.

To demonstrate that a defendant is prejudiced by his counsel's conduct, he must establish that, but for the act or omission in question, the outcome of his trial would have been different. *Commonwealth v. Small*, 602 Pa. 425, 980 A.2d 549, 559 (2009). Champney's statements to police on May 13, 1998, constituted a significant portion of the Commonwealth's case against him. Indeed, they were crucial in establishing his participation in the murder of Roy Bensinger, particularly where there was no eyewitness testimony, no physical evidence, and no forensic evidence linking him to the offense. As described by the police officers in their reports, which were admitted into evidence, Champney's comments and gestures indicated that he had intimate knowledge as to: where the firearms were kept in the Bensinger residence; how much ammunition was missing from the home; and the fact that the murder weapon had not been destroyed, but was being held by an undisclosed individual. One could further imply guilt from Champney's inquiry as to what he was "looking at," and his direction to Sergeant Shinskie to get the District Attorney so that he could "lay it out for him." Such expressions of knowledge about the offense, which were emphasized by the Commonwealth in its closing argument, likely had a profound impact on the jury.[7] Moreover, and most significantly, the admission of the statements Champney made on May 13, 1998, gave substantial credence to the otherwise arguably biased testimony of key Commonwealth witnesses David Blickley and Joy Hinshaw.

The testimony of David Blickley, that Champney took him to Bensinger's driveway and explained how he shot him, was significantly discredited on cross-examination as the jury was made aware that Blickley did not report Champney's involvement in the murder until more than five years after the offense when Blickley had been arrested on charges alleging that he escaped from prison. N.T. Trial Volume I, at 246.

7. While damaging, the admissible October 8, 1998, statement that Champney would rather be sentenced to death than spend his life in jail was not as prejudicial as his previous statements, as it did not include an implicit admission of guilt for the instant offense or recognition of facts that would only be known by someone involved in the murder.

Further, Blickley acknowledged that he "was hoping to get a sentencing break" from his testimony against Champney, *id.* at 246, and that he had previously been convicted of providing false information to police. *Id.* at 264.

Joy Hinshaw testified that when Champney had sought employment at her trucking company, he informed her that he was the subject of a murder investigation. Hinshaw nevertheless hired Champney, who later told her that he had "popped" someone in the head in their driveway, and wanted to change his license plate to read "1–shot" to commemorate the occasion. Hinshaw did not explain why she would hire someone who had just indicated that he was the subject of a murder investigation. Further, Hinshaw noted that, at the time she provided information to police, she had accused Champney of stealing a trailer and wanted him fired. Simply put, the testimony of the two primary witnesses against Champney was far from compelling, and, absent the incriminating statements Champney made to police on May 13, 1998, there is a reasonable probability that the jury would not have given as much weight to such testimony, thus rendering a different outcome at trial.

Accordingly, upon careful review, I find ample support in the record for the PCRA court's determination that there was arguable merit to Champney's claim that trial counsel was ineffective for failing to seek suppression of the statements he made on May, 13, 1998, on the ground that admission of such statements violated his Fifth Amendment right to counsel; that trial counsel lacked a reasonable basis for failing to do so; and that Champney was prejudiced by trial counsel's omission. Having found support in the record for the lower court's findings of fact, and having determined that the legal conclusions drawn therefrom are free of legal error, I would affirm the decision of the PCRA court, which granted Champney a new trial.

Justice ORIE MELVIN did not participate in the decision of this case.

Justice SAYLOR and Justice TODD join this opinion in support of affirmance.

Justice EAKIN files an opinion in support of reversal in which Chief Justice CASTILLE and Justice McCAFFERY join.

### OPINION IN SUPPORT OF REVERSAL

Justice EAKIN.

The Commonwealth appeals from the order granting Ronald Champney relief under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541–9546, in the form of a new trial. Champney has filed a protective cross-appeal from the denial of relief on his other claims in his PCRA petition. We would reverse the PCRA court's findings of ineffectiveness in two instances, and would remand for a determination of cumulative prejudice regarding the court's other three findings of ineffectiveness. We would not reach the remainder of Champney's guilt phase claims, which the PCRA court rejected as meritless.

### I. Background and Procedural History

A detailed account of the facts underlying Champney's conviction is set forth in our opinion on direct appeal, *see Commonwealth v. Champney*, 574 Pa. 435, 832 A.2d 403 (2003); however, we briefly review the facts salient to the issues before us. Champney was hired by Beth Bensinger to kill her husband, which Champney accomplished by shooting the victim on June 4, 1992. Five years later, David Blickley, who was the father of Bensinger's daughter and a suspect in arranging the murder, told police Champney had confided to him that he shot the victim.

Champney was arrested on unrelated robbery charges October 23, 1997; he was placed in county prison and represented by Attorney Frank Cori. Police, who were planning to question Champney about other unspecified criminal conduct (presumably the murder), contacted Attorney Cori to see if he was representing Champney in any other criminal matter besides

the robbery charges. Attorney Cori assured them he was only representing Champney for the robbery.

On November 25, 1997, two officers were driving Champney to a hearing on the robbery charges; one of them questioned Champney about the murder. Champney stated if they wanted him to go to the police station, he would rather have an attorney present at that location. The officers asked no further questions.

On December 23, 1997, the same officers were transporting Champney to another proceeding concerning the robbery, and the same officer asked Champney if he shot the murder victim. Champney replied, "I think I should talk to Frank Cori before I make any statement." N.T. PCRA Hearing, 3/20/07, at 207. The officer ceased questioning Champney, but memorialized the statement in his police report.

On May 13, 1998, the same officer met with Champney in a conference room at the prison where he remained incarcerated on the robbery charges; the purpose of the meeting was to interview Champney about his involvement in other unsolved crimes, including the murder. The officer gave Champney *Miranda*[1] warnings and had him sign a written waiver of his right to counsel. When the officer told Champney that people had implicated him in the murder, Champney asked the officer what he was "looking at." N.T. Trial Vol. II, 10/22/99, at 400. The officer believed this comment referred to what probable jail time Champney faced if convicted, and told Champney he would have to talk to the district attorney regarding any deals. Champney told the officer to get the district attorney so that Champney could "lay everything out for him." *Id.*, at 401. Additionally, when the officer mentioned that a rifle was missing from the Bensinger residence, Champney stated the guns were kept in a locker in the basement; he also nodded affirmatively when the officer stated three bullets were missing from the Bensinger home. *Id.* Champney indicated the murder weapon had not been destroyed, but refused to disclose who currently possessed it. *Id.*, at 402. When the

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

officer stated an individual named Chris Reber was involved in the murder, Champney excitedly told the officer Reber was not involved, but had only "dropped" him off. *Id.*

Champney was arrested for the murder, and on October 8, 1998, the same officer had a conversation with him while driving him to his preliminary arraignment. The officer provided *Miranda* warnings and had Champney sign a written waiver of his right to counsel. While Champney was reading the probable cause affidavit, he made an unsolicited remark that Beth Bensinger probably got immunity. *Id.*, at 404–05. The officer told him that was not the case and suggested he might wish to speak to the district attorney. *Id.*, at 405. Champney stated he would not make a deal, but would take the death penalty because he did not want to spend his life in prison. *Id.*

Champney's trial counsel [2] moved to suppress his May 13, 1998 statement, alleging it was not voluntarily made because the police pressured Champney. Counsel did not challenge the statement on the grounds that Champney had invoked his Fifth Amendment right to counsel, and did not seek suppression of the October 8, 1998 statement at all. The trial court denied the motion. At trial, there was no physical evidence linking Champney to the crime. The Commonwealth presented Champney's May 13, and October 8, 1998 statements through the testimony of Sergeant David Shinskie, the officer to whom the statements were made, as well as statements Champney made to Blickley and Joy Hinshaw, Champney's former employer.

Specifically, Blickley testified Champney explained to him how he killed the victim after Bensinger hired him, and demonstrated at the crime scene how he committed the offense. Blickley said Champney admitted he stole the same weapons and ammunition that were noted as missing from the Bensinger home. Blickley testified he was currently serving a federal sentence on unrelated charges and did not expect any lenience from federal or state authorities in exchange for his

2. Champney was not represented by Attorney Cori regarding the homicide.

testimony. He stated he had been in state custody prior to serving his federal sentence, and his first parole application was opposed by the district attorney because he was a suspect in the Bensinger homicide; he testified he had to serve 15 months longer in prison because of the district attorney's opposition. He also stated he had attempted to give police information about the murder as early as 1993. On cross-examination, Blickley acknowledged he did not provide this information to police until five years after the murder, shortly after he had been arrested on federal escape charges; he also admitted he had an extensive criminal history, which included providing false evidence to police, and he hoped to obtain leniency in sentencing in exchange for his testimony. *See* N.T. Trial Vol. I, 10/21/99, at 237–40, 246–48, 264–65.

Hinshaw testified she interviewed Champney in 1995 for a truck driving position. At the interview, Champney explained he had been involved in a murder investigation but had been cleared of any wrongdoing. Hinshaw stated when she asked Champney if he committed a murder, he grinned and said nothing could be proven, after which she hired him. Hinshaw said Champney later told her and other employees that he had "popped" somebody in the head in a driveway, N.T. Trial Vol. II, 10/22/99, at 316, but did not specify when or where the incident occurred, or who the victim was. According to Hinshaw, Champney indicated he wanted his license plate to read "1–shot" to commemorate his deed. *Id.*, at 317–18.

The Commonwealth also presented evidence that Champney had fled the state after the murder, as well as neighbors' testimony that they heard a gunshot between 6:00 and 7:00 p.m. the date of the incident. Forensics evidence established the victim's time of death was between 5:30 and 6:30 p.m. on that date. Champney did not testify, but presented purported alibi witnesses, none of whom were able to account for his whereabouts before sunset (specifically, 8:31 p.m.) on the day of the murder. In closing, the prosecutor emphasized Champney did not immediately deny involvement in the murder when the officer told him people had implicated him; rather, Champney asked about his potential sentence and told the

officer to get the district attorney so he could "lay it out for him." N.T. Trial Vol. II, 10/25/99, at 676–77. Trial counsel did not object to these references.

The jury convicted Champney of first degree murder and related offenses. Following the penalty phase hearing, it found two aggravating circumstances: Champney contracted to be paid by another person for killing the victim, 42 Pa.C.S. § 9711(d)(2); and Champney had a significant history of felony convictions involving the use or threat of violence, *id.*, § 9711(d)(9). The jury concluded these aggravators outweighed the "catch-all" mitigating circumstance established under § 9711(e)(8), and returned a verdict of death.

Champney appealed, and this Court remanded for a hearing on his newly-discovered evidence claim; Champney alleged the Commonwealth failed to disclose the arrangements it made with Blickley in exchange for his testimony. The hearing produced no evidence to support Champney's claim, and the trial court denied relief. On direct appeal, we affirmed the conviction and death sentence. *Champney,* at 417. The United States Supreme Court subsequently denied *certiorari. Champney v. Pennsylvania,* 542 U.S. 939, 124 S.Ct. 2906, 159 L.Ed.2d 816 (2004).

Champney filed a PCRA petition June 1, 2005, raising 28 issues. Among his multiple penalty phase issues was the claim that trial counsel was ineffective for failing to object to victim impact evidence.[3] As the PCRA court could not determine how the jury considered the victim impact evidence in weighing the aggravating and mitigating circumstances, the parties agreed Champney was entitled to a new penalty phase. Accordingly, Champney agreed to forego presenting evidence

3. Although the Legislature amended the Sentencing Code in 1995 to permit the introduction of such evidence during the penalty phase of a capital case, *see* 42 Pa.C.S. § 9711(a)(2), the amendment applied only to sentences imposed for offenses occurring on or after the amendment's effective date. *See* Act of Oct. 11, 1995, No. 22, 1995 P.L. 1064 (Spec.Sess. No. 1). Since Champney's offense occurred in 1992, before the amendment was effective, victim impact evidence was inadmissible at his penalty phase.

regarding his other penalty phase claims, and the PCRA hearings focused solely on his guilt phase issues.

The same judge who presided at Champney's trial conducted his PCRA hearings. Following the hearings, the PCRA court concluded Champney was entitled to a new trial. The court found: (1) trial counsel was ineffective for failing to seek suppression of Champney's May 13, and October 8, 1998 statements on the grounds they violated his Fifth Amendment right to counsel, which he invoked December, 23, 1997, by stating, "I think I should talk to Frank Cori before I make a statement."; (2) the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose documentation that the district attorney did not oppose Blickley's second parole application, which could have been used to impeach Blickley, and trial counsel was ineffective for failing to obtain such documents by subpoenaing Blickley's parole file; (3) trial counsel was ineffective for failing to impeach Blickley with police reports that did not indicate Champney took Blickley to the crime scene and demonstrated how the shooting occurred; (4) trial counsel was ineffective for failing to retain a crime reconstruction expert to impeach Blickley's testimony regarding where Champney and the victim were standing when the fatal shot was fired; and (5) trial counsel was ineffective for failing to object to the prosecutor's reference, during closing argument, to Champney's right to remain silent by commenting Champney did not deny involvement in the crime when he was first questioned.

The PCRA court held these five issues had arguable merit, counsel had no reasonable basis for her performance related to each issue, and counsel's performance prejudiced Champney. The court concluded, "Each of trial counsel's errors involve issues that were critical to the case, and each, by itself, raises a reasonable probability that the outcome of [Champney's] trial would have been different. The court finds that together they constitute ineffective representation of counsel...." PCRA Court Opinion, 6/3/08, at 56. Accordingly, the court granted Champney a new trial based on these five claims; it rejected Champney's remaining guilt phase issues

on their merits. The Commonwealth appealed from the grant of a new trial, and Champney cross-appealed from the denial of his remaining guilt phase claims.

In reviewing the grant or denial of post-conviction relief, we examine whether the PCRA court's determination is supported by the record and free of legal error. *Commonwealth v. Birdsong*, 611 Pa. 203, 24 A.3d 319, 326 (2011) (citation omitted). To be entitled to relief under the PCRA, a petitioner must establish, by a preponderance of the evidence, that his conviction or sentence resulted from one or more of the enumerated errors or defects found in 42 Pa.C.S. § 9543(a)(2), his claims have not been previously litigated or waived, *id.*, § 9543(a)(3), and "the failure to litigate the issue prior to or during trial, ... or on direct appeal could not have been the result of any rational, strategic or tactical decision by counsel." *Id.*, § 9543(a)(4). An issue is previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue...." *Id.*, § 9544(a)(2). An issue is waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal, or in a prior state postconviction proceeding." *Id.*, § 9544(b).

As the issues Champney raised in his PCRA petition involved claims of trial counsel's ineffectiveness, he was required to prove the underlying claim is of arguable merit, counsel's performance lacked a reasonable basis, and counsel's ineffectiveness caused him prejudice. *Commonwealth v. Pierce*, 567 Pa. 186, 786 A.2d 203, 213 (2001); *see also Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973, 974 (1987).[4] Prejudice in the context of ineffective assistance of counsel means demonstrating there is a reasonable probability that, but for counsel's error, the outcome of the proceeding would have been different. *Commonwealth v. Kimball*, 555 Pa. 299, 724 A.2d 326, 332 (1999). Failure to establish any prong of the test will defeat an ineffectiveness claim. *Commonwealth v. Basemore*,

4. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (enunciating "performance and prejudice" test by which to assess counsel's stewardship).

560 Pa. 258, 744 A.2d 717, 738 n. 23 (2000) (citing *Commonwealth v. Rollins*, 558 Pa. 532, 738 A.2d 435, 441 (1999) (ordinarily, post conviction claim of ineffective assistance of counsel may be denied by showing petitioner's evidence fails to meet any one of three prongs for claim)).[5]

## II.  Commonwealth's Issues

### A.  *Brady* Claim

The Commonwealth claims the PCRA court erred in concluding the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in failing to disclose Blickley's state parole board records to the defense. The Commonwealth further challenges the PCRA court's conclusion that trial counsel was ineffective for failing to discover these records.

Under *Brady*, "a prosecutor has an obligation to disclose all exculpatory information material to the guilt or punishment of an accused, including evidence of an impeachment nature." *Commonwealth v. Spotz* [610 Pa. 17], 18 A.3d 244, 275–76 (Pa.2011) (citation omitted). To establish a *Brady* violation, appellant must demonstrate: the evidence at issue was favorable to him, because it was either exculpatory or could have been used for impeachment; the prosecution

---

5.  At the time Champney filed his PCRA petition in 2005, he was no longer required to raise claims of trial counsel's ineffectiveness at the first opportunity when he had new counsel upon pain of waiver. *See Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002); *Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687 (1977). *Grant* abrogated *Hubbard*'s rule that ineffectiveness claims based on trial counsel's performance must be raised at the first opportunity where a defendant has new counsel, and instead held a defendant "should wait to raise claims of ineffective assistance of trial counsel until collateral review." *Grant*, at 738. Thus, the need to "layer" ineffectiveness claims no longer existed when Champney filed his petition. Furthermore, Champney was represented by the same counsel at trial and on direct appeal; therefore, his first opportunity to challenge trial counsel's performance was on collateral review, and he did not need to "layer" his ineffectiveness claims even under the old rule. However, in an abundance of caution, he pled both trial and appellate counsel's ineffectiveness in his PCRA petition. *See* PCRA Petition, 6/1/05, at 9. Pursuant to *Grant*, we need only focus on trial counsel's performance in our analysis of the parties' issues.

either willfully or inadvertently suppressed the evidence;
and prejudice ensued. *Id.,* at 276 (citation omitted). "The
evidence at issue must have been 'material evidence that
deprived the defendant of a fair trial.' ... 'Favorable
evidence is material ... if there is a reasonable probability
that, had the evidence been disclosed to the defense, the
result of the proceeding would have been different.' " *Id.*
(citations omitted).

*Commonwealth v. Walker,* 613 Pa. 601, 36 A.3d 1, 9 (2011).
Furthermore, "[t]he mere possibility that an item of undis-
closed information might have helped the defense, or might
have affected the outcome of the trial, does not establish
materiality in the constitutional sense." *Commonwealth v.
Chambers,* 570 Pa. 3, 807 A.2d 872, 887 (2002) (quoting *United
States v. Agurs,* 427 U.S. 97, 109–10, 96 S.Ct. 2392, 49 L.Ed.2d
342 (1976)).

Blickley's state parole board records contained information
regarding his two applications for parole. The first, which he
testified about at trial, was denied in 1994 after the district
attorney wrote a letter vehemently opposing parole because
Blickley was a principal in an extensive criminal network, was
under investigation in the Bensinger murder, and in the
district attorney's opinion, Blickley's "duplicity knows no
bounds." *See* Schuylkill County District Attorney's Letter,
9/26/94, at 1. The second application, which was not mentioned
at trial, was granted in 1995, following the district attorney's
response that he would not object to such grant. Earlier in
1995, Blickley had offered to assist the police in the Bensinger
murder investigation if his second parole application was not
opposed.

The PCRA court noted the absence of information concern-
ing the district attorney's initial opposition to parole and
subsequent change of mind, apparently for Blickley's mere
promise to help with the investigation, impaired Champney's
ability to impeach Blickley's testimony, which was the strong-
est evidence against Champney. The court further held trial
counsel should have discovered the existence of the parole
records because they were referenced in the police report,

which counsel had. The court concluded Champney was prejudiced by the absence of this evidence, which would have "further weakened" and "further undermined" Blickley's testimony. *See* PCRA Court Opinion, 6/3/08, at 53.

We would conclude the PCRA court's determination that trial counsel was capable of discovering the parole board records because the police report mentioned them negates its conclusion that the records were *Brady* material, which the Commonwealth was under obligation to disclose. "There is no *Brady* violation when the appellant knew or, with reasonable diligence, could have uncovered the evidence in question...." *Commonwealth v. Spotz,* 610 Pa. 17, 18 A.3d 244, 276 (2011); *see Commonwealth v. Collins,* 585 Pa. 45, 888 A.2d 564, 578 (2005) (no due process violation where parties had equal access to information or if defendant could have uncovered such information with reasonable diligence). Accordingly, we would hold the Commonwealth's failure to disclose Blickley's parole records did not violate *Brady,* and we turn to the issue of trial counsel's performance.

Blickley was the Commonwealth's key witness; the jury heard his testimony regarding how Champney relayed to him the details of the murder. The jury also heard Blickley imply he served 15 months longer in state prison because his first parole application was denied, *see* N.T. Trial Vol. I, 10/21/99, at 238; the jury never heard that the district attorney's subsequent change of mind, occurring after Blickley promised to cooperate with the murder investigation, may have affected the parole board's decision to release Blickley. The board also had other new information, including Blickley's rescue of a female prison staff member taken hostage. *See* N.T. PCRA Hearing, 7/9/07, at 71. Trial counsel admitted Blickley was such a "huge" witness "that anything that would have attacked his motive for being there would have been key." N.T. PCRA Hearing, 3/20/07, at 94. Counsel commented, "There wouldn't be a question you could ask about something that would destroy the testimony of David Blickley that I wouldn't want to ask." *Id.,* at 120. Trial counsel was in possession of the police report that mentioned the officer interviewed Blickley,

who "indicated that he would be willing to assist [the police] in this case if his pending parole this year was not opposed." Homicide Investigation Action Report of Trooper Allen W. Smith, 6/19/95. Despite having this information, which indicated the possibility of being able to impeach Blickley's motive for testifying, trial counsel stated it simply did not occur to her to obtain the parole records. *See* N.T. PCRA Hearing, 7/9/07, at 98–99 (stipulating trial counsel's affidavit stated, "I did not subpoena these records or otherwise seek to obtain them. I had no tactical or strategic reason for not doing so. It simply did not occur to me."). The PCRA court concluded trial counsel's omission was prejudicial to Champney's case, both by itself and in conjunction with trial counsel's other errors.

The Commonwealth argues trial counsel was able to explore the issue of motive on cross-examination of Blickley by pointing out that he did not offer the police any information until five years after the murder, and he was hoping for leniency on his federal sentence. *See* N.T. PCRA Hearing, 3/20/07, at 150; N.T. Trial Vol. I, 10/21/99, at 246–47. Blickley himself testified that the district attorney opposed his original parole. *See* N.T. Trial Vol. I, 10/21/99, at 238. The Commonwealth further points out the trial court instructed the jury that Blickley's testimony may have been motivated by the hope of a federal sentence reduction, and the jury should view Blickley's testimony with caution. *See* N.T. Trial Vol. II, 10/25/99, at 692–93. Therefore, the Commonwealth contends Champney was not prejudiced by trial counsel's failure to obtain Blickley's parole records for impeachment purposes.

Impeachment of a key witness is indisputably crucial, and counsel offered no strategic reason for failing to pursue evidence which would have reiterated a motive for Blickley's suspect motive for testifying, even if cumulative. Thus, we would find the first two prongs of the *Pierce* ineffectiveness test are met. However, since trial counsel did elicit Blickley's acknowledged hope for a more lenient federal sentence, we are unconvinced counsel's failure to introduce Blickley's parole records resulted in the type of prejudice required under

*Strickland. See Kimball,* at 332 (prejudice in context of ineffectiveness means there is reasonable probability that, but for counsel's error, outcome of proceeding would have differed). Thus, we disagree with the PCRA court's conclusion that counsel's omission, alone, prejudiced Champney's case. However, because prejudice may be the cumulative result of multiple omissions by counsel, *see Commonwealth v. Johnson,* 600 Pa. 329, 966 A.2d 523, 532 (2009) (where multiple instances of deficient performance are found, assessment of prejudice properly may be premised upon cumulation), we reserve final determination of whether a new trial is warranted until we have evaluated the remaining issues regarding trial counsel's performance.

### B. Invocation of the Fifth Amendment Right to Counsel

The Commonwealth claims the PCRA court erred in holding trial counsel was ineffective for failing to seek suppression of Champney's May 13 and October 8, 1998 statements to police on the grounds they were made in the absence of counsel after Champney invoked his Fifth Amendment right to counsel on December 23, 1997. The Commonwealth contends Champney's statement, "I think I should talk to Frank Cori before I make a statement," was equivocal and conditional. The Commonwealth points to *Davis v. United States,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), which held the defendant's statement, "Maybe I should talk to a lawyer," as understood by a reasonable police officer in light of the circumstances, was not an unequivocal assertion of the right to counsel. *Id.,* at 462, 114 S.Ct. 2350. The Commonwealth argues Champney's statement was similar to that in *Davis;* furthermore, the officers here knew Frank Cori was not representing Champney in any charges arising from the homicide. Finally, the Commonwealth argues the PCRA court inconsistently found Champney invoked his right to have Cori present when it also found Cori would have been conflicted in representing Champney in the homicide case. *See* PCRA Court Opinion, 6/3/08, at 18–20.

Champney counters that *Davis* is inapposite; there, the defendant clarified his statement, saying he did not really want an attorney, and the United States Supreme Court deferred to the lower court's finding that the statement was ambiguous.[6] Here, Champney argues we should defer to the trial court's finding the statement was unambiguous; the police understood it as a request for counsel and treated it as such, ceasing their questioning. Champney further points out, unlike *Davis*, he referred to a *specific* attorney, not just *any* attorney; therefore, his request constituted an unequivocal assertion of his right to have an attorney present. He argues he was in continuous custody from his 1997 arrest for robbery until his arrest in the instant case, and his statements were elicited by police interrogation, which was initiated after his invocation of his right to counsel; therefore, regardless of the number of times police gave him *Miranda* warnings before he made the statements, such statements were involuntary and inadmissible. Finally, Champney points to trial counsel's PCRA hearing testimony that she had no tactical or strategic reason for not raising the issue of Champney's invocation of his right to counsel when she litigated his suppression motion.

The PCRA court concluded although Champney's November 25, 1997 statement that he would prefer having an attorney present if he were to go to the police station was "conditional and somewhat ambiguous," PCRA Court Opinion, 6/3/08, at 14, it could not make the same conclusion regarding the December 23, 1997 statement:

> [W]e cannot accept the Commonwealth's argument that [Champney's] request on December 23, 1997, to see Cori before making a statement was ambiguous merely because he used the word "think" within that statement. We believe that a reasonable police officer in Sgt. Shinskie's circumstances at the time would have understood Champney's statement to be a request for an attorney before making a

6. Despite arguing *Davis* is distinguishable, Champney notes the police in that case understood the defendant's assertion to be an unambiguous request for counsel and ceased questioning him.

statement. In fact, apparently Sgt. Shinskie understood it exactly that way and ceased further questioning at the time.

Had trial counsel moved to suppress Champney's statements, which were used against him at trial, on the basis that they were made without the presence of counsel after he had invoked his right to counsel, the evidence of those statements would have been unavailable to the Commonwealth at trial. We find this claim of the petitioner to be of arguable merit. His trial counsel freely acknowledged she had no tactical strategic reason for not litigating the issue.

*Id.*, at 14–15 (internal citation omitted). Accordingly, the court concluded this instance of trial counsel's ineffectiveness, by itself and coupled with counsel's other instances of deficient stewardship, undermined the fairness of Champney's trial such that he was entitled to a new one.

In reviewing the grant or denial of post-conviction relief, the PCRA court's credibility determinations are binding on this Court when the record supports them. *Commonwealth v. Hutchinson*, 611 Pa. 280, 25 A.3d 277, 284 (2011). However, we apply a de novo standard of review to the PCRA court's legal conclusions, or to mixed questions of law and fact, such as whether capital counsel's performance fell below what the Sixth Amendment requires. *See Commonwealth v. Rios*, 591 Pa. 583, 920 A.2d 790, 810 (2007). As this Court has observed:

In [*Rios* ], a majority of the Court adopted a de novo review standard for the mixed question of law and fact concerning whether capital counsel's performance fell beneath the constitutionally [sic] floor. This position derived from former Chief Justice Cappy's concurring opinion in *Commonwealth v. Gorby*, 589 Pa. 364, 909 A.2d 775 (2006), in which he elaborated that "this [in] no way alters the principle that 'the trial court is in the best position to review claims related to trial counsel's error in the first instance as that is the court that observed firsthand counsel's allegedly deficient performance.'" Indeed, the former Chief Justice stressed that he "would continue to accept the factual findings and credibility determinations of the PCRA court that are supported by the record."

*Commonwealth v. Sattazahn,* 597 Pa. 648, 952 A.2d 640, 657 n. 10 (2008) (internal citations omitted). Accordingly, we review the issue regarding counsel's failure to argue Champney's statements were obtained in violation of his Fifth Amendment right to counsel *de novo,* as it presents a mixed question of law and fact.

The Fifth Amendment right to counsel was recognized in *Miranda* to protect a suspect's "desire to deal with the police only through counsel[.]" *McNeil v. Wisconsin,* 501 U.S. 171, 178, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (quoting *Edwards v. Arizona,* 451 U.S. 477, 484, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)). It is not offense-specific; it attaches upon custodial interrogation, and once invoked, prohibits any further questioning of a suspect until counsel is present. *Arizona v. Roberson,* 486 U.S. 675, 686–87, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988); *Miranda,* at 474, 86 S.Ct. 1602. For this right to attach, it must be specifically invoked by the suspect, *McNeil,* at 178, 111 S.Ct. 2204; *Davis v. United States,* 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); once it attaches, the suspect cannot waive it unless counsel is present. *Edwards,* at 484–85, 101 S.Ct. 1880.

To protect an individual's Fifth Amendment privilege against self-incrimination, the United States Supreme Court held if a person in police custody is to be interrogated, he must first be informed "in clear and unequivocal terms" that he has the right to remain silent, anything he says can and will be used against him in court, and he has the right to consult with counsel and to have counsel present during interrogation; if he is indigent, counsel will be appointed for him. *See Miranda,* at 467–69, 471–72, 86 S.Ct. 1602. "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.,* at 473–74, 86 S.Ct. 1602. "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning." *Id.,* at 474, 86 S.Ct. 1602.

In *Edwards*, the Court expanded upon *Miranda*, holding "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards*, at 484, 101 S.Ct. 1880. Further, once the accused has invoked his right to counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.*, at 484–85, 101 S.Ct. 1880; *see Minnick v. Mississippi*, 498 U.S. 146, 150, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990) (*"Edwards* is 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights.' ") (quoting *Michigan v. Harvey*, 494 U.S. 344, 350, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990)). Accordingly, "[i]f the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible ..., even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards." *McNeil*, at 177, 111 S.Ct. 2204.

In *Arizona v. Roberson*, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988), the Court expanded *Edwards* to include reinterrogation on an unrelated crime. The Court considered whether police were permitted to question a suspect, who had invoked his right to counsel for one offense and remained in custody for that offense, three days later regarding an unrelated offense. The Court concluded there was no distinction between this scenario and *Edwards*, for Fifth Amendment purposes, noting, "Whether a contemplated reinterrogation concerns the same or a different offense, or whether the same or different law enforcement authorities are involved in the second investigation, the same need to determine whether the suspect has requested counsel exists." *Id.*, at 687–88, 108 S.Ct. 2093.

After *Roberson*, courts struggled with setting bright-line rules regarding when reinterrogation was too attenuated from the initial interrogation, rendering *Edwards'* presumption of involuntariness inapplicable. The United States Supreme Court subsequently narrowed *Edwards'* rule significantly in *Maryland v. Shatzer*, 559 U.S. 98, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010), which addressed whether the return of a prisoner to the general prison population in between interrogations ends the presumption of involuntariness established in *Edwards*. The Court observed *Edwards'* rule was "not a constitutional mandate, but judicially prescribed prophylaxis," *id.*, at 1220, and concluded it had opened *Edwards'* "protective umbrella" far enough. *Id.*, at 1222. Accordingly, it held a return to the general prison population for at least 14 days in between interrogations constituted a break in custody. *Id.*, at 1223.

Recently, the Court clarified *Shatzer*'s application to situations involving return of a prisoner to confinement in between interrogations. In *Howes v. Fields*, —— U.S. ——, 132 S.Ct. 1181, 182 L.Ed.2d 17 (2012), the Court reiterated "service of a term of imprisonment, without more, is not enough to constitute *Miranda* custody." *Id.*, at 1191. The Court distinguished between persons who have not yet been convicted and sentenced, and those who have, noting:

> [Q]uestioning a person who is already serving a prison term does not generally involve the shock that very often accompanies arrest.

> \*    \*    \*

> [A] prisoner, unlike a person who has not been sentenced to a term of incarceration, is unlikely to be lured into speaking by a longing for prompt release.

> \*    \*    \*

> [A] prisoner, unlike a person who has not been convicted and sentenced, knows that the law enforcement officers who

question him probably lack the authority to affect the duration of his sentence.

*Id.,* at 1190–91.[7]

*Miranda* and its progeny assumed the existence of an unambiguous invocation of the right to counsel. "[*Miranda* and *Edwards* ] require[ ], at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney...." *McNeil,* at 178, 111 S.Ct. 2204. However, in many situations, the reference to counsel made by the suspect is less than straightforward, and courts must then determine whether the right to counsel was actually invoked. The determination of whether a suspect has made an unequivocal invocation of the right to counsel is an objective inquiry. *Davis,* at 458–59, 114 S.Ct. 2350. The suspect

> must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect.

*Id.,* at 459, 114 S.Ct. 2350. The *Davis* Court explained the practical implications of its holding:

> In considering how a suspect must invoke the right to counsel, we must consider the other side of the *Miranda* equation: the need for effective law enforcement. Although the courts ensure compliance with the *Miranda* requirements through the exclusionary rule, it is police officers who must actually decide whether or not they can question a suspect. The *Edwards* rule—questioning must cease if the

7. Assuming Champney unequivocally asserted his right to counsel, the breaks in between his interrogations were longer than the 14-day bright-line rule in *Shatzer* and arguably vitiated his invocation of the right. However, given the fact he was still in county prison, not yet convicted or sentenced, and still awaiting resolution of the charges against him, *Shatzer* 's applicability is questionable. *See Commonwealth v. Keaton,* 615 Pa. 675, 45 A.3d 1050, 1068 n. 9 (2012) (citing *Howes,* at 1190–91). As our conclusion there was no Fifth Amendment violation is not based on *Shatzer,* see infra, its applicability would not need to be addressed by the parties on remand.

suspect asks for a lawyer—provides a bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information. But if we were to require questioning to cease if a suspect makes a statement that *might* be a request for an attorney, this clarity and ease of application would be lost. Police officers would be forced to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he has not said so, with the threat of suppression if they guess wrong. We therefore hold that, after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney. Of course, when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney.... Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel. But we decline to adopt a rule requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him.

To recapitulate: We held in *Miranda* that a suspect is entitled to the assistance of counsel during custodial interrogation even though the Constitution does not provide for such assistance. We held in *Edwards* that if the suspect invokes the right to counsel at any time, the police must immediately cease questioning him until an attorney is present. But we are unwilling to create a third layer of prophylaxis to prevent police questioning when the suspect *might* want a lawyer. Unless the suspect actually requests an attorney, questioning may continue.

*Id.*, at 461–62, 114 S.Ct. 2350 (emphasis in original).

The PCRA court in the instant case held a reasonable officer, hearing Champney's comment, "I think I should talk to Frank Cori before I make a statement[,]" would understand it

to be an invocation of his right to counsel. Champney argues as much, contending his reference to a specific attorney, as opposed to the general reference to counsel in *Davis* makes that case distinguishable. We disagree; we would find Champney's statement articulated an ambiguous sentiment similar to the *Davis* statement. Qualifying any declaration with the words "I think" is simply not the same as asserting an unambiguous decision. If our Court could examine and characterize the tone, demeanor, emphasis, or body language of the declarant, we might be allowed to find the sentiment expressed by Champney was other than ambiguous—but we are not afforded that opportunity.

We would conclude the sentiment expressed in the record simply is not an assertion of rights that is *unequivocal*—it might have been meant as such, and it might not have been, but in this analysis, the asserting party does not get "the benefit of the doubt," a concept that is a long, long way from unequivocal. The United States Supreme Court's recent decision in *Berghuis v. Thompkins*, 560 U.S. 370, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010), illustrates this concept. The Court considered whether Thompkins invoked his right to remain silent by not saying anything for nearly three hours before making incriminating statements during a police interrogation. *See id.*, at 2256–57. The Court observed that although it had not yet stated whether invocation of the right to remain silent could be ambiguous or equivocal, there was "no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel at issue in *Davis*." *Id.*, at 2260. The Court reiterated *Davis'* requirement of an "unambiguous invocation of *Miranda* rights" and held:

Thompkins did not say that he wanted to remain silent or that he did not want to talk with the police. Had he made either of these simple, unambiguous statements, he would have invoked his right to cut off questioning. Here he did neither, so he did not invoke his right to remain silent.

*Id.*, at 2260 (internal quotation and citations omitted).

Thus, *Berghuis* signals a fairly clear resolve by the United States Supreme Court, which initially fashioned *Miranda*'s

prophylactic rule, that courts are not obliged to shield suspects when construing unclear indications from defendants in custody. The High Court has repeatedly indicated *Miranda* should not be employed to defeat society's interest in prosecuting criminal activity whenever nuances of interpretation exist. This view is amply supported by other federal and state courts considering similar statements. *See, e.g., United States v. Zamora*, 222 F.3d 756, 765–66 (10th Cir.2000) (defendant's statement that "I might want to talk to my attorney" was not clear invocation); *Burket v. Angelone*, 208 F.3d 172, 198 (4th Cir.2000) (statement that "I think I need a lawyer" was not clear invocation); *Diaz v. Senkowski*, 76 F.3d 61, 63–65 (2d Cir.1996) (statements that "I think I want a lawyer" and "Do you think I need a lawyer?" were not clear invocations); *Ex parte Cothren*, 705 So.2d 861, 863, 866 (Ala.1997) (statement, "I think I want to talk to a lawyer before I answer that," in response to question about when defendant last possessed murder weapon, found to be equivocal); *State v. Eastlack*, 180 Ariz. 243, 883 P.2d 999, 1006–07 (1994) (defendant's statement, "I think I better talk to a lawyer first" was equivocal); *see also* Wayne R. LaFave *et al.*, Criminal Procedure § 6.9(g) (5th ed.2009) (collecting cases).

Accordingly, we would conclude Champney did not invoke his right to counsel with sufficient clarity as to render trial counsel ineffective for deciding not to seek suppression of the statement made months later. We would hold the PCRA court erred in concluding otherwise, and would reverse its ruling on this issue.

## C. Trial Counsel's Failure to Impeach Blickley with a Police Report

The Commonwealth claims the PCRA court erred in holding trial counsel was ineffective for failing to impeach Blickley with a police report, which was in counsel's possession. The report, concerning Blickley's December 16, 1997 police interview, showed Blickley did not tell police Champney took him to the crime scene and told him about the murder there. The report stated Blickley told police Champney visited him in

prison the day after the murder and told him to watch the news; Blickley further stated Champney visited him in prison and said the victim's wife asked Champney to kill the victim, to which Blickley responded that she had asked him, too. According to Blickley's interview, Champney told him the details of the murder while he was in prison; Blickley showed police the logistics of the shooting by pointing to places on a small photograph of the crime scene. He said nothing about Champney taking him to the crime scene and confiding how the shooting took place, which was the centerpiece of his trial testimony. *See* Homicide Investigation Action Report of Sergeant David Shinskie, 12/17/97. Sergeant Shinskie's PCRA testimony confirmed Blickley never mentioned Champney took him to the crime scene and confided in him there, despite being asked to tell Sergeant Shinskie everything he knew about the murder. N.T. PCRA Hearing, 3/20/07, at 188–90, 193–94. Sergeant Shinskie also testified it appeared to him that Blickley was trying to find out what the police knew about the murder, in order to curry favor for himself as he faced federal sentencing. *Id.*, at 182–85, 195–97.

The PCRA court held trial counsel's failure to use the report or Sergeant Shinskie's testimony about the report to rebut Blickley's testimony prejudiced Champney. *See* PCRA Court Opinion, 6/3/08, at 52, 56. The Commonwealth argues the fact that Blickley's police interview differed from his trial testimony regarding how he found out Champney committed the murder is immaterial, as the jury was made aware Champney confided to Blickley about the shooting; it does not matter whether the confidence was exchanged at the crime scene or at prison.

As the PCRA court noted, however, Blickley was a key Commonwealth witness. His testimony included his detailed account of Champney taking him to the crime scene, where Champney reenacted how the murder was committed. Had counsel been able to show omission of this account from Blickley's initial police interview, as well as Blickley's potential motive for testifying in order to get a reduction in his federal sentence, she would have impeached his credibility by imply-

ing he fabricated Champney's confession. The police report also would have contradicted Blickley's contention on cross-examination that the victim's wife never asked him to kill her husband. *See* N.T. Trial Vol. I, 10/21/99, at 242. Counsel acknowledged it would have been important to impeach Blickley with the fact he failed to tell police Champney took him to the crime scene, and she offered no tactical or strategic reason for not using the report. *See* N.T. PCRA Hearing, 3/20/07, at 100–04.

Accordingly, we agree with the PCRA court that the first two prongs of the *Pierce* test have been met with respect to this claim, but we do not agree this omission by counsel was alone sufficient to prejudice Champney's case. As the Commonwealth points out, the specifics of the crime are not dependent on the site of disclosure. Further, the report was that of someone other than Blickley; the report would likely have helped erode Blickley's credibility, but its main value was to show Blickley claimed Champney confessed to him. However, because prejudice may be the cumulative result of multiple omissions by counsel, *see Johnson*, at 532, we reserve final determination of whether a new trial is warranted until we have reviewed the remaining ineffectiveness claims.

### D. Trial Counsel's Failure to Hire a Forensic Expert

The Commonwealth argues the PCRA court erred in concluding trial counsel was ineffective for failing to hire a forensic expert to impeach Blickley's testimony concerning the logistics of the shooting. At trial, the Commonwealth presented a forensic pathology expert who based his opinion on the evidence obtained from the autopsy he conducted; he opined the fatal shot was fired from a distance. *See* N.T. Trial Vol. I, 10/21/99, at 178. On cross-examination, the expert admitted he was unable to testify exactly how far the shooter was standing from the victim, where the shooter stood, or how the victim was standing when he fell. *Id.*, at 181–84. At the PCRA hearing, Ralph Tressel, an expert in crime scene analysis and reconstruction, opined the victim's body would have been lying with the head in the opposite direction if the

shot had been fired from the location Blickley described. *See* N.T. PCRA Hearing, 3/21/07, at 111–12. Using the velocity data for the murder weapon, the location of the bullet wound, and the blood spatter pattern on the victim's shoes, Mr. Tressel testified the victim had to have fallen backwards onto the ground, with no twisting or turning. *See id.,* at 86, 90–93, 96, 98–100. He also testified the fact there was no exit wound did not comport with Blickley's testimony concerning the distance from the shooter to the victim. *See id.,* at 115–16. Finally, Tressel testified that at the time of trial, an expert in crime scene analysis would have been able to offer the same opinion as his, based on a review of the same evidence analyzed in a similar fashion. *Id.,* at 118–19.

The PCRA court found Mr. Tressel's testimony "very convincing[,]" PCRA Court Opinion, 6/3/08, at 40, and concluded if trial counsel had presented similar testimony that was accepted by the jury, the obvious inference would have been that Blickley fabricated Champney's confession. *See id.* Accordingly, the court held the absence of such testimony prejudiced Champney.

The Commonwealth contends Mr. Tressel's opinion rested on vague and ambiguous information; it argues Blickley's trial testimony did not make apparent the location from which he claimed the fatal shot was fired. *See* N.T. Trial Vol. I, 10/21/99, at 234 (Blickley testified Champney told him he went "over here to this corner of this garage. . . ."). The Commonwealth contends without knowing which corner Blickley was identifying, Mr. Tressel could not conclude with certainty where the shooter allegedly stood, and notes the expert admitted this ambiguity had posed a problem for him. *See* N.T. PCRA Hearing, 3/21/07, at 88–89 (Mr. Tressel commented, "I had the same problem with trial transcripts," in response to Commonwealth's remark that testimony from transcripts contained only vague notations "here" and "there."). Accordingly, the Commonwealth claims Mr. Tressel's opinion that the shot could not have been fired from the location Blickley identified was suspect, and would not have aided Champney's defense.

The Commonwealth overlooks the fact that a statement Blickley gave the FBI on April 13, 1999 had a hand-drawn sketch attached to it, in which Blickley drew the crime scene and the alleged location where Champney said he stood when he shot the victim. Mr. Tressel acknowledged this sketch during his testimony, when he stated the shot could not have come from where Blickley stated Champney said it did. *See id.*, at 107–08. Although Mr. Tressel could not tell with certainty the shooter's exact location, he was able to ascertain the area, which was contrary to the location Blickley identified. *See id.*, at 111–12. That was enough to cast doubt on Blickley's testimony.

Trial counsel's cross-examination of the Commonwealth's forensic expert indicated she was aware of the need to impeach Blickley's testimony; she questioned the expert regarding the distance between the shooter and the victim, where the shooter and the victim were standing, and the direction in which the victim would have fallen. *See* N.T. Trial Vol. I, 10/21/99, at 180–84. Counsel elicited the expert's omission that he could not opine with certainty regarding the location from which the shot was fired, *see id.*, at 182, but this impeached only the testimony of the expert, not Blickley.

Had counsel been able to offer evidence directly contradicting Blickley's version of events, it is suggested it would have cast doubt on Blickley's testimony and suggested he fabricated Champney's account of the shooting. This is possible, but Blickley testified to locations and distances told to him by Champney, not details of which he had first-hand knowledge. Contradictions, therefore, do not fall necessarily at the feet of Blickley.

At the PCRA hearing, trial counsel testified although she did not recall the extent of her communications with a forensic expert she had contacted, *see* N.T. PCRA Hearing, 3/20/07, at 27–30, she wanted an expert opinion concerning the location of the shooter, which would have been helpful in refuting Blickley's account as supposedly told to him by Champney. *Id.*, at 30–31. Counsel testified she had no strategic or tactical reason for not calling such an expert to testify. *Id.*, at 32.

We agree with the PCRA court that this claim possesses arguable merit and counsel had no reasonable basis for not offering expert testimony at trial to impeach Blickley. We do not agree that this omission, standing alone, prejudiced Champney's case; however, in light of *Johnson*, we will review the rest of the claims concerning counsel's performance to determine their cumulative effect on the proceeding. *See Johnson*, at 532.

### E. Trial Counsel's Failure to Object to the Prosecutor's Comment on Champney's Silence

The Commonwealth argues the PCRA court erred in concluding trial counsel was ineffective for failing to object, request a curative instruction, or move for a mistrial when, during closing argument, the prosecutor referenced Champney's silence. During the May 13, 1998 interview, the officer told Champney others had implicated him in the murder, Champney asked the officer what he was "looking at." N.T. Trial Vol. II, 10/22/99, at 400. The officer responded the district attorney would make the decision regarding what probable jail time Champney faced if convicted. Champney told the officer to get the district attorney so that Champney could "lay everything out" for him. *Id.*, at 401. In her closing statement, the prosecutor highlighted this exchange:

Sergeant Shinskie ... wanted to make sure when he was talking to the Defendant on this day that the Defendant knew they were talking about this case, this case, the Roy Bensinger homicide case, and he's telling him different people are implicating you, Mr. Champney, you the Defendant in this case, in this case. *If you were involved—if you were not involved in this case whatsoever, if you didn't know anything about that, isn't that what you would have told Sergeant Shinskie on May 13th of 1998? Of course you would have.* It makes sense. One of the things I always want to argue to a jury is use your good American common sense. *If you know nothing about this case, if you believe that somebody else is involved, aren't you going to tell the police that? Of course you are. May 13th of 1998*

*did the Defendant do that? No. He asks Sergeant Shinskie at that time what he was looking at, how much time he would get for this offense.* Use that good American common sense, ladies and gentlemen. Use it. Sergeant Shinskie tells him I have to talk to the District Attorney about that. You go get the D.A., and I'll lay it out for him. Twenty year veteran of the state police and there's no evidence whatsoever that he harbors any ill will against this particular Defendant, and what Sergeant Shinskie's testimony does, ladies and gentlemen, beyond a reasonable doubt is *shows [sic] you that the Defendant was involved in this murder.*

N.T. Trial Vol. II, 10/25/99, at 676–77 (emphasis added).

The PCRA court held the prosecutor's statements constituted impermissible comment on Champney's post-arrest silence; furthermore, Champney's silence was used to prove his guilt. The PCRA court concluded because the prosecutor was the source of the reference to Champney's silence and asked the jury to find Champney guilty because he did not deny his guilt in the face of police questioning, the reference was prejudicial. *See* PCRA Court Opinion, 6/3/08, at 46–48, 56. Furthermore, the court noted trial counsel offered no tactical reason for failing to object to this reference. *See* N.T. PCRA Hearing, 3/20/07, at 123–25.

The Commonwealth contends the prosecutor's reference to Champney's statement did not constitute a comment on post-arrest silence. The Commonwealth argues although Champney was in custody for an unrelated burglary at the time he was interviewed about the murder, he was not arrested for the murder until after the interview was concluded; thus, his statements were made pre-arrest, and reference to them was permissible.[8] The Commonwealth further argues Champney

8. In *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the United States Supreme Court held prosecutorial comment on a defendant's post-*Miranda* silence may violate due process, and the prosecutor may not impeach a testifying defendant with his post-*Miranda* silence. *Id.,* at 619, 96 S.Ct. 2240. In *Fletcher v. Weir,* 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982), the Court subsequently held cross-examination of a testifying defendant regarding post-arrest

was not silent; he made an unsolicited comment after the officer's factual statement that others were implicating him. Accordingly, the Commonwealth contends Champney did not exercise his privilege against self-incrimination.

We need not address whether Champney's May 13, 1998 interview should be classified as occurring pre- or post-arrest, as we would find his statement to the officer did not constitute silence within the meaning of the Fifth Amendment privilege against self-incrimination. In *Commonwealth v. Jermyn*, 516 Pa. 460, 533 A.2d 74 (1987), we held the exercise of the privilege "does not extend to instances in which the defendant does not remain silent but instead volunteers equivocal responses to police questioning." *Id.*, at 81 (citing *Commonwealth v. Jefferson*, 430 Pa. 532, 243 A.2d 412 (1968)). In *Jermyn*, the prosecutor elicited testimony from a police officer concerning the defendant's "tacit admissions" in the course of questioning concerning the victim's death:

[WITNESS]: When I told him I thought he was the one that committed the homicide his response was, "Really".

[PROSECUTOR]: Did he seem excited at all, was he indignant?

[WITNESS]: Not at all.

[PROSECUTOR]: *Did he ever deny it?*

[WITNESS]: *No, he did not.*

\*    \*    \*

silence does not violate due process if the silence occurred prior to the issuance of *Miranda* warnings. *Id.*, at 607, 102 S.Ct. 1309. This Court rejected *Fletcher* in *Commonwealth v. Turner*, 499 Pa. 579, 454 A.2d 537 (1982), holding that under Art. I, § 8 of the Pennsylvania Constitution, *Doyle's* protection extended to the entire post-arrest period, regardless of whether *Miranda* warnings were given prior to the defendant's statements. *Id.*, at 540. "Both this Court and the High Court, however, have determined that there is no violation of due process when prearrest, pre-*Miranda* silence is used at trial to impeach a testifying defendant." *Commonwealth v. Spotz*, 582 Pa. 207, 870 A.2d 822, 831 (2005) (citing *Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980); *Commonwealth v. Bolus*, 545 Pa. 103, 680 A.2d 839 (1996)). Here, Champney was given *Miranda* warnings prior to the interview; therefore, had he chosen to remain silent, the protections of the Fifth Amendment were available to him.

[PROSECUTOR]: Did you confront him ... about his involvement in this particular act?

[WITNESS]: Yes, I did.

[PROSECUTOR]: And what did he say at that time?

[WITNESS]: His first response was, "It sounds like you got it all figured out in your mind." And a second response was, "I'm not saying one way or another, you tell me whether I'm under arrest."

[PROSECUTOR]: *He never denied killing his mother?*

[WITNESS]: *He did not.*

*Id.,* at 80–81 (quoting RR. 552a–554a) (emphasis in original). We held:

In the instant case [the defendant] did not exercise his right to remain silent. He elected to respond to the police officer's accusations in an equivocal fashion, neither admitting nor denying guilt but implicitly challenging the police to prove their charge. To that extent the introduction of his statements does not amount to a Fifth Amendment violation. Once a suspect elects to make responses, the import of those responses are properly available for the jury's consideration. In such a case the right to remain silent is not implicated. The evasiveness of such answers can properly be considered by the factfinder and inferences drawn therefrom.

*Id.,* at 81 (citations omitted).

Here, as in *Jermyn,* the prosecutor made reference not to the defendant's silence, but to his statement—specifically, to the fact he asked about the potential length of his sentence instead of denying his guilt. This is not the same as an assertion of the Fifth Amendment privilege, and should not be equated as silence simply because Champney said one thing instead of another. It would be absurd to permit a defendant, after waiving his right to remain silent, to make statements to the police and then invoke the Fifth Amendment to prevent being questioned about the contents of the statements he made; this would go beyond the protections offered by the Fifth Amendment. Once Champney waived his rights and

made his comment, he assented to having that comment, and any inferences drawn therefrom, used against him.

Furthermore, Champney's query concerning sentence length was followed by more incriminating statements, which we have ruled were admissible, *supra.* In these other statements, Champney revealed knowledge about the murder weapon and clarified that another individual had dropped him off at the crime scene. We would find no impropriety in the prosecution's reference to Champney's choice to ask about consequences rather than deny involvement. Accordingly, we would hold the PCRA court erred in concluding trial counsel was ineffective for failing to object to the prosecutor's comment, and would reverse the PCRA court's ruling on this issue.

### F. Cumulative Prejudice Analysis

The Commonwealth contends the PCRA court erred in concluding the five instances of error by trial counsel were cumulatively prejudicial to Champney. Citing *Commonwealth v. Williams,* 532 Pa. 265, 615 A.2d 716, 722 (1992) (no number of failed claims may collectively attain merit if they could not do so individually), the Commonwealth argues the PCRA court erroneously considered the synergistic effect of trial counsel's missteps and granted relief.

As mentioned previously, the PCRA court found each instance where trial counsel's representation fell below acceptable standards, "by itself, raises a reasonable probability that the outcome of the petitioner's trial would have been different." PCRA Court Opinion, 6/3/08, at 56. The court further concluded counsel's errors, together, constituted ineffectiveness so prejudicial to Champney that he was entitled to a new trial. *Id.* Contrary to the Commonwealth's assertion, the PCRA court did not base its finding of prejudice solely on the cumulative effect of counsel's errors; it initially stated each error, individually, was enough to warrant a finding of prejudice. *Id.* However, the Commonwealth argues the court failed to offer a clear analysis regarding how each one of counsel's errors prejudiced Champney, and that the law does not permit consideration of the cumulative effect of these errors.

At the time the PCRA court issued its opinion, as well as when the appellate briefs were filed in this matter, this Court had not addressed the issue of whether individual instances of ineffectiveness could be considered together in determining prejudice. While this matter was pending on appeal, however, in *Commonwealth v. Johnson*, 600 Pa. 329, 966 A.2d 523 (2009), this Court recognized "that if multiple instances of [ineffectiveness] are found, the assessment of prejudice properly may be premised upon cumulation." *Id.*, at 532 (citing *Commonwealth v. Perry*, 537 Pa. 385, 644 A.2d 705, 709 (1994) (finding multiple instances of ineffectiveness, "in combination," prejudiced defendant)); *see also Commonwealth v. Koehler*, 614 Pa. 159, 36 A.3d 121, 161 (2012) (to extent claims are rejected for lack or arguable merit, there is no basis for accumulation claim; however, when failure of individual claims is grounded in lack of prejudice, cumulative prejudice from those claims may properly be assessed); *Commonwealth v. Hanible*, 612 Pa. 183, 30 A.3d 426, 483 (2011) (same); *Commonwealth v. Hutchinson*, 611 Pa. 280, 25 A.3d 277, 319 (2011) (stating "cumulative prejudice from individual claims may be properly assessed in the aggregate when the individual claims have failed due to lack of prejudice").

Thus, to the extent the PCRA court held instances of ineffectiveness may be considered together in assessing prejudice, the law now reflects this principle, and we would not reverse on this basis. However, in light of the fact we would reverse the PCRA court's findings of ineffectiveness in two instances (the admission of Champney's May 13 and October 8 statements and the prosecutor's comment on silence), as well as our conclusion that counsel's remaining three omissions (relating to impeachment of Blickley) were not individually prejudicial, it must be determined whether these remaining omissions were cumulatively prejudicial.

The three omissions all pertain to impeachment of the Commonwealth's key witness, Blickley: counsel's failure to discover Blickley's parole board records and use them to attack his motive for testifying; counsel's failure to impeach

Blickley with the report from his police interview, in which Champney's reenactment at the crime scene was never mentioned; and counsel's failure to use a forensic expert to contradict the logistics of the shooting. The PCRA court noted Blickley's testimony was arguably the strongest evidence against Champney, as it was the only evidence containing a direct admission by Champney that he shot the victim. However, in light of our position that Champney's May 13 and October 8 inculpatory statements to police were properly admitted, we cannot determine whether the PCRA court would have concluded the omissions in the impeachment of Blickley were cumulatively prejudicial. It is the probability of a different result, not the possibility of such, that is needed for relief.

We would conclude none of these omissions, standing alone, is sufficiently prejudicial to warrant a new trial, but there has been no initial determination by the PCRA court regarding the cumulative prejudice of only these three omissions; the PCRA court's ruling was based on its finding five instances of error by trial counsel. It is not the role of this Court to evaluate cumulative prejudice if the PCRA court has not first had the opportunity to rule on this issue. *See Sears v. Upton,* 561 U.S. 945, 130 S.Ct. 3259, 3267, 177 L.Ed.2d 1025 (2010) (remanding for proper weighing of mitigating evidence in determining prejudice, and noting it is lower court's province to undertake such reweighing in first instance). Accordingly, we would remand for the PCRA court to determine whether trial counsel's three omissions regarding impeachment of Blickley were cumulatively prejudicial, such as would warrant a new trial. We would not reach Champney's remaining guilt phase claims.

Justice ORIE MELVIN did not participate in the decision of this case.

Chief Justice CASTILLE and Justice McCAFFERY join this opinion in support of reversal.

Justice BAER files an opinion in support of affirmance in which Justice SAYLOR and Justice TODD join.