2021 PA Super 201

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MAURICE GREEN | : | |
| | : | |
| Appellant | : | No. 391 EDA 2020 |

Appeal from the Judgment of Sentence Entered December 12, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0002747-2017

BEFORE: OLSON, J., McCAFFERY, J., and MUSMANNO, J.

OPINION BY MUSMANNO, J.:                     Filed: October 7, 2021

Maurice Green ("Green") appeals from the judgment of sentence imposed following his convictions of one count each of first-degree murder, carrying a firearm without a license, carrying a firearm on public street in Philadelphia, possessing instruments of crime, and recklessly endangering another person.[1] We reverse and remand for a new trial.[2]

On December 24, 2016, at approximately 8:45 a.m., Marie Buck ("Marie") was shot and killed in her convenience store located near the intersection of 6th and Titan Streets in South Philadelphia, Pennsylvania. A man entered Marie's store, aimed a firearm at her, and shot her ten times.

---

[1] 18 Pa.C.S.A. §§ 2502(a), 6106(a)(1), 6108, 907, 2705.

[2] Additionally, in light of our disposition, we deny Green's Motion for Remand as moot.

The man fled from the store. A short time later, at approximately 8:47 a.m., the gunman, later identified as Green, was seen on video surveillance entering a black Chevrolet Impala, located nearby.

Philadelphia Police Homicide Detective Omar Jenkins ("Detective Jenkins") was assigned to investigate the shooting death of Marie. During the investigation, he spoke to Angela White ("White"), Green's on-and-off drug dealer and paramour. White stated that Green had been selling her drugs to support her addiction. In June 2016, during one of these sales, Green left White alone in his house. After Green left, White spoke with Robert Buck ("Buck"), Marie's grandson, who conspired with White to steal Green's favorite gold chain necklace. White stole Green's gold chain and met Buck later that day. Buck thereafter pawned Green's gold chain for approximately $2,000.00 and used the money to buy drugs from a different drug dealer. White and Buck each stated that they avoided Green for approximately six months after the theft. Nevertheless, White subsequently returned to purchase drugs from Green, at which time Green assaulted White over the theft of the gold chain.

On December 28, 2016, four days after the shooting death of Marie, Green was arrested and brought to the Philadelphia Police homicide unit at approximately 10:30 p.m. A continuous audio and video recording was made of Green throughout the time he was at the police station. While there was

no written statement prepared by Green, the entirety of Green's discussions with Detective Jenkins were transcribed into a 72-page transcript.[3]

At approximately 10:50 p.m., Green was advised of his **Miranda**[4] rights, after which Green requested his attorney, Robert Gamburg, Esquire ("Attorney Gamburg"). Detective Jenkins stopped questioning Green about the homicide, but continued to ask Green for biographic and identifying information. Prior to leaving the room, Detective Jenkins offered Green food, water, and bathroom privileges. Additionally, Detective Jenkins stated that if Green "wanted to speak with him without the presence of his attorney, he should summon a detective by knocking on [the] door." N.T. (Suppression Hearing), 10/24/18, at 6. Detective Jenkins proceeded to leave the interview room.

A few hours later, Green knocked on the interview room door and asked whether Attorney Gamburg had been contacted. The detective informed Green that Attorney Gamburg had been called, but had not yet responded. Green informed the detective that he would talk, but denied doing anything wrong. Detective Jenkins informed Green that they would need to again

---

[3] The transcript of Green's discussion with the Detectives was entered into the record as Commonwealth Exhibit 129. **See** N.T. (Suppression Hearing), 10/23/18, at 96 (wherein Commonwealth Exhibit 129 was entered into the record).

[4] **Miranda v. Arizona**, 384 U.S. 436 (1966).

review Green's **Miranda** rights with him, and Green indicated his assent.[5] Additionally, Detective Jenkins asked another detective, Detective Billy Golphin (collectively, the "Detectives"), to sit in on the interview with Green.

Green subsequently spoke to the Detectives for several hours about the allegations. Green admitted that he owns a black Chevrolet Impala, but disputed the allegation that he was at 6th and Titan Streets on December 24, 2016. Further, Green vehemently denied the shooting and proclaimed that he had no issues with Buck. After the interview concluded, the Commonwealth charged Green with, *inter alia*, the above-mentioned offenses in relation to the shooting death of Marie.

The Commonwealth filed a Pre-Trial Motion in which it sought to introduce prior bad acts evidence pursuant to Pa.R.E. 404(b).[6] In particular, the Commonwealth sought to present evidence regarding an incident that took

---

[5] Additionally, we note that Green reviewed and signed the **Miranda** warnings form and it was admitted into the record as Commonwealth Exhibit 127. **See** N.T. (Suppression Hearing), 10/23/18, at 96-97 (wherein Commonwealth Exhibit 127 was entered into the record).

[6] At the hearing announcing its ruling on the Commonwealth's Pre-Trial Motion, the trial court stated that the Commonwealth filed its Pre-Trial Motion on April 16, 2018. **See** N.T. (Motions Hearing), 10/11/18, at 9. However, the certified record on appeal does not include the Motion, nor is there any entry for such a motion on the docket. Nevertheless, this omission does not impede our review, because the Motion and its contents were thoroughly litigated on the record. **See id.** at 4-14 (wherein the trial court issued its Order and Opinion on the record); **see also** N.T. (Pre-Trial Hearing), 9/6/18 at 4-42 (wherein both the Commonwealth and Attorney Gamburg argued at length, including citations, regarding the admissibility and the purpose of the Rule 404(b) evidence).

place 14 months prior. During that incident, Green allegedly had a physical altercation over a drug dispute with an individual named "Jay," and in retaliation, shot at the house of "Jay's" grandmother, Levonya Ladson ("Ladson").[7] However, no arrests were made regarding this incident, and no charges were filed. The Commonwealth argued that the Ladson incident was committed by Green, and demonstrated that Green had a common scheme or plan of committing retribution against the grandmothers of his protagonists. On September 6, 2018, the trial court conducted a hearing on the Commonwealth's Pre-Trial Motion and, on October 11, 2018, granted the Commonwealth's Motion.

Shortly thereafter, Green waived his right to counsel and elected to proceed *pro se*, with Attorney Gamburg acting as standby counsel. On October 23, 2018, Green presented a *pro se* oral Motion to Suppress the statements he gave the Detectives on the night he was arrested. In particular, Green claimed he had invoked his right to counsel, and had requested that the Detectives contact Attorney Gamburg. Green claimed that the Detectives did not contact Attorney Gamburg, and instead improperly re-commenced questioning Green. After a hearing, the trial court denied Green's Motion to Suppress.

---

[7] We discuss the detailed facts of this incident *infra*.

On October 24, 2018, Green proceeded to a jury trial with new standby counsel, Gary Server, Esquire ("Attorney Server"). On November 6, 2018, the trial court declared a mistrial, because the jury was unable to return a unanimous verdict.

On December 3, 2019, a second jury trial commenced, with Green appearing *pro se* and Attorney Server again present as standby counsel. At the close of this jury trial, on December 12, 2019, Green was convicted of the above-mentioned offenses. On the same day, the trial court sentenced Green to an aggregate term of life in prison.

On December 13, 2019, Attorney Server filed a Motion to Withdraw as counsel and a post-sentence Motion on Green's behalf. On December 23, 2019, the trial court denied Green's post-sentence Motion and granted Attorney Server's Motion to Withdraw. Contemporaneously, the trial court appointed James Berardinelli, Esquire ("Attorney Berardinelli"), to represent Green. Green then filed two timely, *pro se*, Notices of Appeal,[8] as well as two *pro se* Supplemental post-sentence Motions, and a Motion for a writ of *habeas*

---

[8] We note that "[i]n this Commonwealth, hybrid representation is not permitted." *See Commonwealth v. Jette*, 23 A.3d 1032, 1036 (Pa. 2011). However, in the context of a *pro se* Notice of Appeal, "this Court is required to docket a *pro se* Notice of appeal despite [a]ppellant being represented by counsel[.]" *Commonwealth v. Williams*, 151 A.3d 621, 624 (Pa. Super. 2016).

*corpus*. Subsequently, Attorney Berardinelli filed a timely, counseled, Notice of Appeal.[9]

Attorney Berardinelli filed an appellate brief; however, he subsequently withdrew from representation, and the trial court appointed Stephen O'Hanlon, Esquire ("Attorney O'Hanlon"), as appellate counsel for Green. Attorney O'Hanlon filed, and this Court subsequently granted, a Motion to Strike Attorney Berardinelli's appellate brief. Additionally, this Court granted Attorney O'Hanlon leave to file a new appellate brief.

On May 4, 2021, Green, through Attorney O'Hanlon, filed a counseled Motion to Remand for an evidentiary hearing on newly-discovered evidence. Green averred that the Commonwealth disclosed late-discovered materials tending to show that "Detective Jenkins and his former partner, Detective [James] Pitts, have been involved in numerous cases wherein confessions have been forced." Appellant's Motion to Remand for Evidentiary Hearing, 5/4/21, at 1, 3. The Commonwealth has filed a Response.

Green now raises the following issues for our review:

1. Did the trial court err in denying [Green]'s [M]otion to [S]uppress his inculpatory statement to police where[,] after [Green had] invoked his right to counsel, Detective Jenkins reinitiated contact with [Green] by instructing him, "if [Green] wanted to speak with him without an attorney he should summon

_____

[9] The trial judge retired and did not order Green to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal, nor did the trial judge file a Rule 1925(a) opinion. Nevertheless, with regard to Green's claims, the trial judge issued thorough rulings on the record; therefore, we need not remand for a new Rule 1925(a) opinion.

him," in violation of **Minnick v. Mississippi**, 498 U.S. 146 (1990) and its progeny?

2. Did the trial court err and abuse its discretion by allowing harmful prior bad acts evidence[,] when such evidence had a very limited evidentiary connection to [Green] and caused irreparable harm to [Green] at trial?

Brief for Appellant at 4.

In his first claim, Green argues that the trial court erred in denying his Motion to Suppress his "inculpatory" statement to the Detectives. **Id.** at 12. Green contends that Detective Jenkins improperly "reinitiated contact with him by instructing[,] 'If [Green] wanted to speak with him without an attorney[,] he should summon him.'" **Id.** In particular, Green argues that Detective Jenkins's statement violated **Minnick**, because Jenkins continued initiating contact with Green after Green had invoked his right to counsel. Brief for Appellant at 13-14.

In reviewing the denial of a suppression motion,

[w]e may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. An appellate court, of course, is not bound by the suppression court's conclusions of law.

**Commonwealth v. Hampton**, 204 A.3d 452, 456 (Pa. Super. 2019). Such an inquiry must take into account the totality of the circumstances. **Commonwealth v. Delvalle**, 74 A.3d 1081, 1085 (Pa. Super. 2013).

Additionally, our Supreme Court has explained that

[i]n **Miranda**, the United States Supreme Court determined that in order to protect the Fifth Amendment privilege against self-incrimination from the inherently compelling pressures of custodial interrogation, "[i]f an individual states that he wants an attorney, the interrogation must cease until an attorney is present."

In [**Edwards v. Arizona**, 451 U.S. 477 (1981),] the Court determined that additional safeguards for the **Miranda** right to counsel were necessary and held that once a suspect asserts the right, he may not be further interrogated "until counsel has been made available to him…."

Recently, in **Minnick**, the Court clarified the **Edwards** rule by holding that "when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney."

**Commonwealth v. Santiago**, 599 A.2d 200, 201 (Pa. 1991) (paragraph breaks added; citations omitted). "**Edwards** is 'designed to prevent police from badgering a defendant into waiving his previously[-]asserted **Miranda** rights.'" **Commonwealth v. Champney**, 65 A.3d 386, 401 (Pa. 2013) (quoting **Minnick**, 498 U.S. at 150).

Instantly, the record reflects that Green initially invoked his **Miranda** rights. N.T. (Jury Trial), 10/24/18, at 5. Additionally, after Green's invocation, Detective Jenkins ceased questioning Green about the homicide, but continued to ask Green for biographical information. **Id.** at 6. Further, Detective Jenkins informed Green that if he wished to speak without his attorney present, he could knock on the door to summon Detective Jenkins. **Id.**; **see also** Commonwealth Exhibit 129, at 1-5.

After a few hours, Green knocked on the door of the interview room and asked Detective Jenkins whether his attorney had been contacted. N.T. (Suppression Hearing), 10/23/18, at 105; *see also* Commonwealth Exhibit 129, at 10. Detective Jenkins responded that the police had called Green's attorney, but had not yet received a response. N.T. (Suppression Hearing), 10/23/18, at 105-07; *see also* Commonwealth Exhibit 129, at 10-11. Within minutes, Green stated that he no longer needed his attorney, denied doing anything wrong, and stated his desire to speak with the Detectives. N.T. (Suppression Hearing), 10/23/18, at 105-07; *see also* Commonwealth Exhibit 129 at 11-12. Detective Jenkins advised Green that he would have to re-review Green's *Miranda* rights with him, after which Green agreed to waive his rights. N.T. (Suppression Hearing), 10/23/18, at 124; *see also* Commonwealth Exhibit 129, at 12-13.

Our review of the record confirms that the trial court's findings are supported by the record, and its legal conclusions are sound. *See Hampton*, *supra*. Indeed, the trial court determined that Green had properly invoked his *Miranda* rights at 10:50 p.m., before relinquishing them a few hours later. N.T. (Suppression Hearing), 10/23/18, at 105, 123-24. Thus, we conclude that Green, without provocation or improper questioning from the police, voluntarily and knowingly relinquished his *Miranda* rights. *See Champney*, *supra*. Accordingly, we cannot grant Green relief on this claim.

In his second issue, Green contends that the trial court erred by admitting evidence of prior bad acts under Pa.R.E. 404(b). Brief for Appellant at 15, 26. Green argues that there was little evidence tying him to the Ladson incident, where "he was not identified, arrested, or prosecuted." *Id.* In particular, Green claims that the Ladson incident did not involve a similar *modus operandi*, because the Ladson incident occurred outside of the victim's home and Ladson was not harmed. *Id.* at 22-23. Green argues, by contrast, that the instant shooting occurred inside of Marie's store and resulted in her death. *Id.* at 22-23. Further, Green asserts that the Ladson incident occurred more than one year before the instant homicide, and there was no evidence that "the instant matter grew out of or had any connection to the prior incident." *Id.* at 23-25. Green states that all of the Commonwealth's evidence was circumstantial, because no one testified that they saw the killer. *Id.* at 19, 26. According to Green, the Ladson incident was offered merely to show that Green had a propensity for committing violence against grandmothers. *Id.* at 26, 29. Green maintains that "the probative value was clearly outweighed by its prejudicial effect," and thus the trial court erred in admitting the evidence under the common plan, scheme, or design exception to Rule 404(b). *Id.* at 19, 27.

"Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." *Commonwealth v. Drumheller*, 808 A.2d 893, 904 (Pa.

2002). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." *Commonwealth v. Harris*, 884 A.2d 920, 924 (Pa. Super. 2005).

Relevance is the threshold for admissibility of evidence. *Commonwealth v. Cook*, 952 A.2d 594, 612 (Pa. 2008). Pursuant to Pa.R.E. 401, evidence is relevant if "(a) it has the tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401. "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." *Drumheller*, 808 A.2d at 904. "All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. "The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

Pennsylvania Rule of Evidence 404(b) provides as follows:

**Rule 404. Character Evidence; Crimes or Other Acts**

* * *

**(b) Crimes, Wrongs or Other Acts.**

*(1) Prohibited Uses*. Evidence of a crime, wrong or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) *Permitted Uses*. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa.R.E. 404(b)(1)-(2).

"[E]vidence of prior crimes is not admissible for the sole purpose of demonstrating a criminal defendant's propensity to commit crimes." ***Commonwealth v. Melendez-Rodriguez***, 856 A.2d 1278, 1283 (Pa. Super. 2004). Nevertheless, "[e]vidence may be admissible in certain circumstances[,] where it is relevant for some other legitimate purpose and not utilized solely to blacken the defendant's character." ***Id.*** Specifically, other crimes evidence is admissible if offered for a non-propensity purpose, such as proof of an actor's knowledge, plan, motive, identity, or absence of mistake or accident. ***Commonwealth v. Chmiel***, 889 A.2d 501, 534 (Pa. 2005). When offered for a legitimate purpose, evidence of prior crimes is admissible if its probative value outweighs its potential for unfair prejudice. ***Commonwealth v. Hairston***, 84 A.3d 657, 664-65 (Pa. 2014).

Unfair prejudice "means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighting the

- 13 -

evidence impartially." ***Commonwealth v. Dillon***, 925 A.2d 131, 141 (Pa. 2007).

> Evidence will not be prohibited merely because it is harmful to the defendant. This Court has stated that it is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged. Moreover, we have upheld the admission of other crimes evidence, when relevant, even where the details of the other crime were extremely grotesque or highly prejudicial.

***Id.***

When ruling upon the admissibility of evidence under the common plan exception, the trial court must examine the details and surrounding circumstances of each criminal incident to assure that the evidence reveals criminal conduct which is distinctive:

> Relevant to such a finding will be the *habits* or *patterns of action or conduct* undertaken by the perpetrator to commit crime, as well as the time, place, and types of victims typically chosen by the perpetrator. Given this initial determination, the court is bound to engage in a careful balancing test to assure that the common plan evidence is not too remote in time to be probative. If the evidence reveals that the details of each criminal incident are *nearly identical*, the fact that the incidents are separated by a lapse of time will not likely prevent the offer of the evidence unless the time lapse is excessive.

***Commonwealth v. Tyson***, 119 A.3d 353, 359 (Pa. Super. 2015) (emphasis added).

Additionally, in order to use Rule 404(b) evidence to establish *identity*, the crimes must be "so similar that logically the same person has committed both acts." ***See Commonwealth v. Rush***, 646 A.2d 557, 561 (Pa. 1994);

- 14 -

*see also id.* (stating that "much more is demanded than the mere repeated commission of crimes of the same class…. The device used must be so *unusual and distinctive* as to be like a *signature*.") (some emphasis in original, emphasis added). In addition, "[t]he Commonwealth must prove beyond a reasonable doubt that a defendant has committed the particular crime of which he is accused, and it may not strip him of the presumption of innocence by proving that he has committed other criminal acts." **Commonwealth v. Ross**, 57 A.3d 85, 98-99 (Pa. Super. 2012) (*en banc*) (citations omitted).

In the instant case, on December 24, 2016, Marie was shot to death in her store at the intersection of 6th and Titan Streets in Philadelphia, Pennsylvania. N.T. (Jury Trial), 12/5/19, at 18-20. The perpetrator entered Marie's store and shot her 10 times with a semi-automatic handgun. **Id.** The Commonwealth posits that Green committed this shooting as retribution against Marie's grandson, Buck, for conspiring with White to steal Green's favorite gold chain necklace. Commonwealth's Brief at 2-4, 17-23.

In support of this theory, the Commonwealth successfully sought the admission of statements from White and Dominic Rosano regarding the Ladson incident, a shooting that occurred at 515 McClellan Street, Philadelphia, on October 26, 2015. N.T. (Pre-Trial Hearing), 9/6/18, at 5-24; **see** N.T. (Motions Hearing), 10/11/18, at 14 (wherein the trial court granted the Commonwealth's Rule 404(b) Motion); **see also** Commonwealth's Brief at 17-23. Relevantly, at some time in the early morning hours of October 26,

2015, an individual named "Jay" beat up Green over a drug-related dispute. N.T. (Pre-Trial Hearing), 9/6/18, at 11. At approximately 6:10 a.m. that same day, an individual wielding a semi-automatic handgun shot at Ladson's front door, from across the street. ***Id.***; ***see also*** N.T. (Jury Trial), 12/9/19, at 244-50 (wherein the Commonwealth introduced evidence of the bullet casings located across the street from Ladson's home, the ballistics analysis, and a nearby surveillance video depicting an individual running away from the scene). Police responded to this incident and performed ballistics testing on the nearby bullet casings, but made no arrests and filed no charges. ***Id.*** at 244-47. Importantly, the ballistics tests revealed that the firearm in the Ladson incident was a different firearm from the one used in the instant shooting. ***See*** Commonwealth Exhibit 122 at 1-14 (detailing the ballistics tests on the bullets used to kill Marie, and revealing that the shooter used a 9-millimeter, semi-automatic, Glock handgun); ***see also*** Commonwealth Exhibit 138 at 13 (unnumbered)[10] (detailing the ballistics tests on the bullets shot at Ladson's home, and revealing that the shooter used a .40 caliber, semi-automatic, Smith & Wesson revolver).

In short, the Commonwealth contends that the shooter in the Ladson incident was Green, and that this evidence demonstrated Green's common

---

[10] We note that this particular portion of Commonwealth Exhibit 138 is referred to as Commonwealth Exhibit "138-D" throughout the proceedings. However, the exhibit bears no marking differentiating it from the rest of Commonwealth Exhibit 138. ***See*** Commonwealth Exhibit 138.

scheme or plan of committing retribution against the grandmothers of people who had wronged him in some way. Commonwealth's Brief at 17-23.

In granting the Commonwealth's Motion to admit evidence of the Ladson incident, the trial court determined that the two shootings were similar, because they had occurred in the same area "near 5th Street in Philadelphia." N.T. (Motions Hearing), 10/11/18, at 13. Additionally, the trial court stated that both incidents involved "shootings in drug-related cases of retribution," committed against "the grandmothers of [Green's] protagonist[s]." **Id.** Further, the trial court determined that both shootings "were committed with a semi[-]automatic firearm" by "a single lone male." **Id.**

Our review of the record does not support the trial court's determination that admission of evidence concerning the Ladson incident demonstrated a common scheme, plan, or design by Green to target grandmothers of protagonists. Rather, our review reveals that the incidents are distinguishable in several significant ways. Initially, the record reflects that Green was never charged with, nor convicted of, the incident at Ladson's home on October 26, 2015. N.T. (Jury Trial), 12/9/19, at 249. In addition, the two shooting incidents were 14 months apart. **See** N.T. (Jury Trial), 12/9/19, at 244-50 (wherein the Commonwealth presented evidence that the Ladson shooting occurred on October 16, 2015); **see also** N.T. (Jury Trial), 12/5/19, at 18-20 (wherein the Commonwealth presented evidence that Marie was shot and killed on December 24, 2016).

Significantly, in the Ladson incident, the individual stood outside of Ladson's home, and shot at the door from across the street. N.T. (Jury Trial), 12/9/19, at 244-50. Ladson was not harmed, and only her door was damaged. *Id.* By contrast, in the instant shooting, the perpetrator entered Marie's store and shot her 10 times, resulting in her death. N.T. (Jury Trial), 12/5/19, at 18-20. These actions are distinct and unique, and therefore do not demonstrate a common scheme or plan. *See Rush*, *supra*; *see also Commonwealth v. Semenza*, 127 A.3d 1, 11 (Pa. Super. 2015) (citing *Ross*, and stating that, generally, uncharged conduct is not admissible to prove a common scheme or plan except if the shared features reflect the defendant's signature).

We further observe, as highlighted *supra*, that the incidents involved different handguns. Indeed, Commonwealth Exhibit 122 detailed that a 9-millimeter, semi-automatic, Blazer Glock handgun was used to kill Marie. *See* Commonwealth Exhibit 122 at 1-14. By contrast, Commonwealth Exhibit 138 revealed that a .40 caliber, semi-automatic, Smith & Wesson revolver was used to shoot at the front door of Ladson's home. *See* Commonwealth Exhibit 138, at 13 (unnumbered). Merely using a similar, but separate, semi-automatic handgun does not generate a common scheme or plan. *See Rush*, *supra*; *Semenza*, *supra*.

Finally, the alleged "retribution" against Ladson for Jay's conduct was almost immediate. Indeed, the Commonwealth presented evidence that

Green had been admitted to the hospital on October 26, 2015, at approximately 9:00 a.m., after a physical altercation with "Jay," which had occurred at approximately 6:00 a.m. *See* N.T. (Jury Trial), 12/5/19, at 185-87. The shooting at Ladson's door took place that same day, approximately three hours before Green was admitted to the hospital. *See id.*; *see also* N.T. (Motions Hearing), 10/11/18, at 14. By contrast, the amount of time for the alleged "retribution" against Marie and Buck was approximately 6 months. *See* N.T. (Jury Trial), 12/5/19, at 161-63 (wherein White testified that sometime in June 2016, she, in conspiracy with Buck, stole Green's gold chain). Importantly, Green was never charged with, nor convicted of, the Ladson incident. Thus, the trial court effectively forced the jury to decide a trial within a trial as to Green's culpability in the prior incident. *See Ross*, *supra*; *Rush*, *supra*.

Based upon the foregoing, we conclude that the trial court improperly admitted evidence of the Ladson incident at the instant jury trial. Evidence regarding the Ladson incident was more prejudicial than probative and was offered for propensity purposes, rather than to demonstrate a common

scheme or plan.[11] **See Dillon**, **supra**; **Melendez-Rodriguez**, **supra**. We therefore reverse Green's judgment of sentence, and remand for a new trial.

Motion denied as moot. Judgment of sentence reversed. Case remanded for a new trial consistent with this Opinion. Superior Court jurisdiction relinquished.

Judge Olson joins the opinion.

Judge McCaffery files a concurring and dissenting opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/7/21

---

[11] In so holding, we emphasize, and indeed the Commonwealth conceded at the Pre-Trial Hearing, that all of the evidence in the instant case is circumstantial, as no direct evidence identified Green as the shooter. N.T. (Pre-Trial Hearing), 9/6/2018, at 10-12. Additionally, Green vehemently denied shooting Marie during his interrogation, after waiving his **Miranda** rights, and throughout the trial proceedings. Therefore the trial court's admission of this evidence was not harmless error.