J-S09030-21

2021 PA Super 201

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MAURICE GREEN | : | |
| | : | |
| Appellant | : | No. 391 EDA 2020 |

Appeal from the Judgment of Sentence Entered December 12, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0002747-2017

BEFORE:    OLSON, J., McCAFFERY, J., and MUSMANNO, J.

CONCURRING & DISSENTING OPINION BY McCAFFERY, J.:

Filed: October 7, 2021

I agree with the Majority's disposition of Appellant Maurice Green's

**Miranda**[1] challenge, and join the denial of relief on that issue. **See** Majority

Op. at 8-10. I likewise join the denial of Green's motion for a remand for a

hearing on alleged newly discovered evidence. However, I would conclude no

relief is due on Green's issue concerning Pa.R.E. 404(b) prior bad acts

evidence, where: (1) it was properly within the trial court's discretion to weigh

whether the prior incident had sufficient commonalities with the instant

homicide to establish admissibility under Rule 404(b); (2) the court gave a

proper jury instruction on the prior bad acts evidence; and (3) any error would

---

[1] **Miranda v. Arizona**, 384 U.S. 436 (1966).

be harmless, as the Commonwealth presented extensive evidence against Green at trial. Thus, I would affirm the judgment of sentence, and do not join the Majority's grant of a new trial. Accordingly, I respectfully concur and dissent.

With respect to Green's Pa.R.E. 404(b) evidence issue, I incorporate the Majority's discussion of the standard of review and relevant authority. **See** Majority Op. at 11-15. I also consider the following evidence and arguments presented by the parties to the trial court.

Four days after the shooting of Marie, Angela White told investigators that Green told her the following: "about a year prior," "a guy named Jay from 5th Street" "beat up" Green over a drug dispute; Green required medical treatment at Methodist Hospital; and Green "shot up [Jay's] grandmother's house," which was also on 5th Street. N.T., 9/6/18, at 11.

Six months after Marie's shooting, investigators interviewed Dominic Rosano, who stated he was present when Green said he "was looking for" Buck (Marie's grandson). N.T., 9/6/18, at 12. When investigators asked Rosano if he knew of other instances in which Green had a gun, Rosano replied: "[Green] shot up McClellan Street between 5th and 6th Street over drugs and money[,] and he bragged he ain't no bitch and nobody messes with his money." **Id.**

Detectives then obtained medical records showing that Green sought treatment at Methodist Hospital on October 26, 2015, at 9:00 a.m. N.T.,

9/6/18, at 13. Green told hospital staff "he was assaulted three hours" earlier but did not want to make a police report.[2] *Id.* at 13-14.

Through further investigation, detectives learned that at 6:00 a.m. that same day, October 26, 2015, gunshots were fired at the 515 McClellan Street home of Levonya Ladson. There were bullet holes in her front door, and police obtained a "real time video [showing] a shooting" and "at the [same] time[,] a single individual . . . running out of the . . . block." N.T., 12/9/19, at 244; N.T., 9/6/18, at 14-16. Ladson told Detective Jenkins she has a grandson, who sometimes resides with her; this grandson is also Green's cousin and heroin dealer. N.T., 9/6/18, at 16-17. No one, however, reported this shooting to police.[3] *Id.* at 14. Furthermore, a firearms examiner confirmed that the gun used to fire at Ladson's home was **not** the gun used in the homicide in this case. *Id.* at 21.

The parties did not dispute the contents of the above evidence — that is, there was no disagreement as to what White, Rosano, and Ladson told police, when and where the gunshots were fired at Ladson's front door, what

_____

[2] At trial, White testified she accompanied Green to Methodist Hospital. N.T., 12/5/19, at 186. She stated: Green "got[ ] in a physical fight" with "J," who was Green's cousin and participated in the same "5th Street" drug ring with Green. *Id.* Green sustained a split lip and got stitches.

[3] At trial, a detective testified that on October 26, 2015, he responded to 911 calls about gunshots heard, "but no victim or any[one] report[ed] damage." N.T., 12/9/19, at 243. Outside Ladson's home, the officers recovered fired cartridge casings. *Id.* at 244.

Green's hospital record stated, and what the surveillance video showed. Instead, the parties' arguments went to whether the weight of this evidence established a common plan, scheme, design, or identity under Rule 404(b).

The Commonwealth argued the prior bad acts evidence was admissible to show a common plan, scheme, design, and identity. The Commonwealth averred the following similarities between the October 2015 gunshots fired at Ladson's door and December 2016 shooting of Marie: "the manner in which the crimes were committed," the type of weapon used — handguns, the "ostensible purpose of the crime," the close locations of the two shootings, and "the type of victim." N.T., 9/6/18, at 29. The assistant district attorney summarized: "[Green was] having a beef with one guy and shooting grand-mom, that's pretty heavy weighty stuff. . . . And this evidence shows [Green] shot another grandmother's house up. . . . [I]n my 25 years in homicide I never dealt with a situation like this." *Id.* at 32.

Green's trial counsel responded that the Commonwealth was improperly attempting to show he "is a person of evil character." N.T., 9/6/18, at 35. Green argued that because there was "a lack of evidence in this homicide, [the Commonwealth] wished to try a second case that [Green] was never charged with[ or] arrested for," and "boot strap [the prior shooting] onto this horrible homicide" of an 81-year old victim on Christmas Eve. *Id.* at 32-33. Green further asserted the prejudicial value of the evidence far outweighed any limited probative value it had. *Id.* at 35.

The trial court announced its ruling at a hearing on October 11, 2018, granting the Commonwealth's motion to admit the prior bad acts evidence. The court found the following similarities between the October 2015 shooting at Ladson's house and the December 2016 shooting of Marie: (1) "both are shootings in drug related cases of retribution;" (2) "both put the grandmothers of [Green's] antagonist[s] at risk;" (3) "both were committed in early morning hours in the area near 5th Street in Philadelphia;" (4) "both were committed with a semiautomatic firearm;" and (5) "a single lone male was captured on video in the area and[/] or leaving the area of each shooting." N.T., 10/11/18, at 13. The court observed the evidence against Green was "largely circumstantial," and found "the Commonwealth['s] need for such prior bad act [evidence] outweighs any potential for prejudice to" him. *Id.* at 14.

I further note the trial court stated it would "issue a cautionary instruction should [Green] request [one] at trial." N.T., 10/11/18, at 14. At the jury trial, the court indeed instructed the jury that the evidence of the October 2015 shooting could only be considered as "tending to show a common scheme or plan in order to establish the identity of the perpetrator . . . in this case," and not as evidence of bad character or criminal tendencies. N.T., 12/12/19, at 23.

I emphasize that on appeal, the parties' arguments are identical to those presented to, and ruled upon by, the trial court. Presently, Green asserts "there was scant evidence" tying him to the prior shooting, where "he was not

identified, arrested, or prosecuted." Green's Brief at 15, 26. He denies there are similarities between the two shootings: (1) there was "no unity of location because . . . the alleged acts took place in different areas of South Philadelphia;" (2) there was "no *modus operandi*," as one incident was the shooting of Marie inside her store but the other was a shooting "externally" at Ladson's home; (3) the prior incident "occurred more than one year before the" instant homicide; and (4) there was no evidence that "the instant matter grew out of or had any connection to the [prior] incident." *Id.* at 22-25. Green also avers: (1) all of the evidence for this homicide was circumstantial, as no one testified they witnessed the killing; and (2) the prior bad act evidence was presented merely to show he had a propensity for committing crimes and he "was a person prone to violence against grandmothers." *Id.* at 19, 26, 29. He maintains "the probative value was clearly outweighed by its prejudicial effect," and thus the trial court erred in admitting the evidence under the common plan, scheme, or design exception to Rule 404. *Id.* at 19, 27.

Green's arguments on appeal would require this Court to reweigh the evidence in his favor, and supplant the trial court's findings with our own determination that the prior bad acts evidence did not sufficiently establish a common plan, scheme, or design under Rule 404(b). In granting this very relief, the Majority has, in my opinion, exceeded our standard of review. *See Commonwealth v. Harris*, 884 A.2d 920, 924 (Pa. Super. 2005) ("Questions

concerning the admissibility of evidence lie within the sound discretion of the trial court, and a reviewing court will not reverse the court's decision on such a question absent a clear abuse of discretion.").

The Majority sets forth no discussion how — or even if — the trial court overrode or misapplied the law, exercised manifestly unreasonable judgment, or acted with "bias, prejudice, ill-will or partiality, as shown by the evidence of record." **See Harris**, 884 A.2d at 924. Indeed, the Majority does not even conclude the trial court abused its discretion. Instead, the Majority arrives at its determination, that the two incidents are not sufficiently similar, based on its own reweighing of the evidence. **See** Majority Op. at 17 ("Our review of the record does not support the trial court's determination that admission of evidence concerning the Ladson incident demonstrated a common scheme, plan, or design by green to target grandmothers of protagonists. Rather, our review reveals that the incidents are distinguishable in several significant ways."). Similarly, the Majority reweighs the evidence and the parties' arguments to find, contrary to the trial court's determination, that the prior bad acts evidence "was more prejudicial than probative." **See id.** at 19.

Additionally, the Majority does not consider the trial court's cautionary instruction to the jury. "[W]hen weighing the potential for prejudice, a trial court may consider how a cautionary jury instruction might ameliorate the prejudicial effect of the proffered evidence." **Commonwealth v. Gilliam**, 249 A.3d 257, 270-71 (Pa. Super. 2021). Here, the court instructed the jury:

You have also heard evidence tending to show that [Green] may have committed another offense for which he is not on trial before you. I am now speaking of the testimony to the effect that [Green quarreled] with an alleged rival drug dealer over drugs and money, and was physically beaten by that person, and that [Green] allegedly retaliated by shooting into the home of the rival's grandmother, Levonya Ladson, on October 26th, 2015.

This evidence is before you for a limited purpose. That is, for the purpose of tending to show a common scheme or plan in order to establish the identity of the perpetrator in the killing in this case, that is, the homicide of Marie Buck which occurred on 12/24/16. This evidence must not be considered by you in any other way other than for the purpose I just stated. You must not regard this evidence as showing that [Green] is a person of bad character or criminal tendencies for which you may be inclined to infer guilt.

N.T., 12/12/19, at 23. "The law presumes that a jury will follow the trial court's instructions," and Green presents no argument to the contrary. *See* ***Commonwealth v. Gilliam***, 249 A.3d 257, 274 (Pa. Super. 2021). Accordingly, in my view, the record does not support the Majority's conclusion that "the trial court effectively forced the jury to decide a trial within a trial as to Green's culpability in the prior incident." *See* Majority Op. at 19.

Finally, the Majority makes no mention of any of the remaining evidence presented at trial. In my view, even if the trial court erred in permitting the prior bad acts evidence, any error was harmless in light of the breadth of the Commonwealth's evidence. This Court has explained:

In the event of an erroneous admission of evidence, a verdict can still be sustained if the error was harmless. An error is harmless if it could not have contributed to the verdict, or stated conversely, an error cannot be harmless if there is a reasonable possibility the error might have contributed to the conviction. [Our Supreme Court has] found harmless error where:

     (1) the error did not prejudice the defendant or the prejudice was de minimis;

     (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or

     (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

The Commonwealth has the burden of proving harmless error beyond a reasonable doubt.

*Commonwealth v. Yocolano*, 169 A.3d 47, 53 (Pa. Super. 2017) (citation omitted).

While the Commonwealth acknowledged its evidence was circumstantial, it presented 23 witnesses over multiple days of trial. *See* Commonwealth's Brief at 9. First, I note that a witness, who was in the store at the time of the shooting, testified that someone, wearing a hat or a black mask, opened "the door half way," fired about six shots, and ran out. N.T., 12/3/19, at 49-51. The witness could only see "a little bit" of the shooter's face, but told police he was wearing black clothes. *Id.* at 50, 58.

The Commonwealth also presented several surveillance videos showing: (1) a Chevrolet Impala drive and park near the intersection of 6th and Titan Streets at 8:45 a.m. on the morning of the homicide; (2) at 8:45 a.m., a person in dark clothing exit the driver's side of the vehicle; and (3) at 8:47 a.m., a person walk toward the same car, from the direction of Marie's corner

store, walk past the car, do "an about-face," enter the car and drive away.[4] N.T., 12/9/19, at 19, 24, 28, 29, 37. Both Buck (Marie's grandson) and White (Green's paramour) identified Green as the person in the surveillance video leaving the store. N.T., 12/10/19, at 157. An expert witness in vehicle identification testified that the Impala in the surveillance videos and Green's Impala were the same vehicle. N.T., 12/9/19, at 112, 122. White similarly identified the Impala as Green's car. N.T., 12/10/19, at 157.

Finally, an expert in historical cell site analysis testified the data showed Green's cell phone was in the following locations: (1) at 8:27 a.m., at his girlfriend's house at 21st and Cross Streets; (2) at 8:47 in the area of the crime; and (3) and 8:49 a.m., still "in the same area but it looks like [the phone is] moving." N.T., 12/11/19, at 11, 29, 30, 32. These cell phone locations were "consistent with the positioning of [the moving] Chevy Impala" captured on the surveillance videos. *Id.* at 33. In light of the foregoing, I would conclude the jury was free to weigh this "uncontradicted evidence of guilt was so overwhelming," and thus any error by the court could not have contributed to the verdict. *See Yocolano*, 169 A.3d at 53.

Applying our standard of review, I believe the trial court acted within its discretion in weighing the evidence and the parties' extensive oral argument.

---

[4] The surveillance videos were taken from private residential surveillance cameras. N.T., 12/9/19, at 20. Additional surveillance video showed the car travelling until 8:49 a.m. *Id.* at 37.

*See generally* N.T., 9/6/18.  A mere "error of judgment" is not sufficient for this Court to reverse an evidentiary ruling.  I would conclude the record does not indicate any misapplication of the law, manifestly unreasonable judgment, bias, prejudice, ill-will, or partiality.  **See Harris**, 884 A.2d at 924.

Accordingly, I would deny relief on Green's evidentiary issue and affirm the judgment of sentence.

For the above reasons, I respectfully concur and dissent.

Judge Olson did not join this concurring/dissenting opinion.

Judge Musmanno did not join this concurring/dissenting opinion.